No. 85,442

S<small>TATE OF</small> K<small>ANSAS</small>, *Appellee*, v. R<small>OMEL</small> M<small>ETTEH</small> A<small>BU</small>-F<small>AKHER</small>, *Appellant*.

(56 P.3d 166)

Opinion filed October 25, 2002.

*Rebecca E. Woodman,* assistant appellate defender, argued the cause, and *Steven R. Zinn,* deputy appellate defender, was with her on the briefs for appellant.

*Steven J. Obermeier,* assistant district attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Romel Metteh Abu-Fakher, from his conviction for the first-degree murder of his wife, Carol Abu-Fakher. He was sentenced to life imprisonment with no parole for 25 years followed by 24 months of postrelease supervision. His appeal comes before this court pursuant to K.S.A. 22-3601(b)(1), the direct appeal statute for first-degree murder convictions and sentences for life imprisonment.

Abu-Fakher was born in Syria, moved to Jordan, and then lived in Thailand from 1978 to 1991. He owned several houses in Thailand and rented two of them to members of the Iraqi Embassy. Abu-Fakher obtained information for the United States Embassy during Operation Desert Storm about a terrorist plan against the United States and its allies, and in exchange the State Department moved Abu-Fakher to the United States in January 1991.

The record revealed that Carol Abu-Fakher, the deceased victim, had a history of mental health problems. Sharon Whitley, Carol's sister, testified that she thought Carol had been institutionalized at some point in 1995 for a bipolar or manic-depressive disorder.

Abu-Fakher met Carol in Virginia in 1995 and married her later that year in Tampa, Florida. The couple began having problems. In July 1997, Abu-Fakher called Tampa police because as he tried to leave the house, Carol pushed him and prevented him from

leaving. Carol continued to push Abu-Fakher even after police arrived. She was arrested and convicted of battery. Abu-Fakher obtained a restraining order, and Carol moved to her son's house. Abu-Fakher filed for divorce in September 1997.

The next time Abu-Fakher heard from Carol was in late 1997, after his Caller ID showed he had received calls from a mental health center. He went to the mental health center and learned that Carol was there. She eventually left the facility with Abu-Faker, but was recommitted to the facility on two more occasions in that time period.

After her last commitment, Abu-Fakher arranged for Carol to fly back to her family in Boonville, Missouri. Abu-Fakher drove to Boonville to speak with Carol's family about getting Carol some help. He stayed for 1 or 2 days and then began driving back to Florida. Carol's family told her to get help or get out, but Carol refused to cooperate and refused to stay. Abu-Fakher called Carol's family from St. Louis and learned she had left, so he returned to Boonville to look for her. He found her at the truck stop and took her to a hotel. The next morning he got her clothes from her family and drove her back to Florida.

Abu-Fakher testified that he decided it would be best for Carol if he moved her closer to her family, so they moved to Olathe, Kansas, in December 1997. There, Carol and Abu-Fakher worked as real estate agents. According to Abu-Fakher, Carol did better but on occasion when something was wrong with her he had to tell her to take her medicine. She thought the medicine made her hair fall out and hated to take it. During the time they lived in Olathe, another incident occurred where Abu-Fakher called the police. He testified, "We argue, she get drunk, she start argue, and I have to call the police to get out."

Whitley characterized Carol as vivacious and strong-willed but "very excitable" when she was ill. Joanna Engle, an acquaintance of Carol, thought of Carol as loud and obnoxious and felt "Carol had something wrong." Engle testified that Carol's behavior toward Abu-Fakher would often vacillate between "lovey-dovey" and "hateful" several times during the course of a social interaction.

In July 1999, Abu-Fakher rented a house to Jamie Saunders. Saunders telephoned Abu-Fakher later that day and asked him out; they had sex that night. Saunders' affair with Abu-Fakher continued until the time of his incarceration. Saunders eventually quit her job to work for Abu-Fakher. Approximately 1 week before Carol's death in September 1999, Abu-Fakher loaned Saunders his black Ford Crown Victoria to drive because her vehicle had been breaking down frequently.

On Saturday, September 18, 1999, Whitley and her husband, Jesse Jackson, drove to Overland Park to visit Carol and Abu-Fakher. Whitley said that "the minute they opened the door, we knew that something was wrong." Carol told them that Abu-Fakher had given their car away and that she suspected that Abu-Fakher and Saunders were having an affair. Abu-Fakher denied the affair and said he gave the car to a business associate who needed it to get to work. Carol argued with Abu-Fakher all day, riding him hard to get the car back. Carol's nagging continued even while Carol, Abu-Fakher, Jackson, and Whitley ate lunch. Whitley testified that she tried to get Carol to stop nagging, but said she would not be quiet. After returning to the house, the arguing continued; Whitley left for an hour because it was more than she could stand. At 5 p.m. she returned to find Carol was "still riding him." Jackson testified that Abu-Fakher tried to leave, but "Carol just stopped in front of him and put her hands up like that (indicating), and he whipped out his little cell phone and he dialed 911, which I had seen him do on a couple of other occasions."

The 911 dispatcher for Overland Park, Leigh Ann Greene, testified that an individual called from a cell phone at 6:11 p.m. on September 18 and said, "I need some help at 9900 Metcalf, please." Greene asked Abu-Fakher what was wrong, and he said, "I'm trying to leave the house and my wife, she is stopping me." Officer Peter O'Malley was dispatched to the Abu-Fakher residence at approximately 6:18 p.m. Abu-Faker was seated on the tailgate of a vehicle in the garage. Carol had locked him out. After officers spoke with Carol, she let Abu-Fakher come into the house to retrieve some clothing. The officers stayed at the residence until Abu-Fakher left in one of the vehicles.

Saunders testified that Abu-Fakher joined her and her mother at a nightclub around 8:30 p.m that night. They had drinks and danced, and Abu-Fakher told Saunders that Carol suspected he was having an affair and he would probably get divorced. Saunders testified that she and Abu-Fakher drove her mother home, then went back to his vehicle; she went home, and he went to his house.

Whitley testified that she had called Carol Sunday morning, September 19, and that Carol sounded great. Carol said she and Abu-Fakher were talking. Whitley thought things were okay between Carol and Abu-Fakher.

On Monday, September 20, Abu-Fakher called Saunders early in the morning and asked her if she could come into the office because he had a family emergency and would not be able to make it. She was surprised to see him stop by the office that morning. Saunders said that usually Abu-Fakher was a very neat person, but that morning he looked rough, his hair was a mess, his clothes were wrinkled, and his voice raspy. At trial, Abu-Fakher stated that Carol had kept him awake arguing all night Sunday and early Monday.

Don Ballard, a friend and business partner of Abu-Fakher, testified that Abu-Fakher telephoned on Monday around 10 or 10:15 a.m. to obtain help and guidance on how to deal with Carol. He wanted Ballard to recommend a doctor he could take Carol to see. Ballard testified that Abu-Fakher told him Carol was out of control, but when police officers were there she would act normal, and then the officers would leave.

On Monday, around 10:45 a.m., the police were again dispatched to 9900 Metcalf in response to a 911 call classified as a disconnect. Deputy Jennifer Hayes of the Wyandotte County Sheriff's Department testified about a tape recording made of the call. A male voice on the tape said, "She won't go with me to emergency." A female could be heard in the background using vulgarity and saying, "Hang up the phone." The male said, "I need some help." The female said, "Well then you are going too because I'm going to tell them what you did. I'm going to tell them what you did."

Officer Elgio Hernandez was dispatched to 9900 Metcalf at 10:52 a.m. Hernandez testified that Abu-Fakher answered the door

and said he had called so officers could have his wife taken to seek psychological counseling. Hernandez spoke with Carol in the kitchen, and she explained that Abu-Fakher had called 911 because he wanted her to be committed or to seek psychological counseling because he felt she was having a nervous breakdown. Carol told Hernandez that they had an appointment at 2 p.m. to see a marital counselor. After questioning both parties, Hernandez informed Abu-Fakher there was nothing they could do to help him due to the fact that Carol had not made any threats toward him verbally or physically.

Kathy Calvert, a clinical social worker and psychotherapist, met with Abu-Fakher and Carol at 2 p.m. on Monday. She testified that Carol would not always respond directly to her questions, but was "oriented to person, place, and all of that kind of thing." Carol told Calvert that her husband was having an affair with a coworker and had given one of their family vehicles to her. She said Abu-Fakher had promised her if she would just come to the appointment he would get the car back from this woman. When Carol asked Abu-Fakher if he was going to get the car back in front of Calvert, he would not respond. Abu-Fakher told Calvert, "Get her records, she has a history of mental illness," and, "[S]he needs help." Calvert's impression was that Abu-Fakher wanted Carol hospitalized or committed in some way. Calvert explained to Abu-Fakher that unless Carol was in imminent danger of harming herself or someone else, she could not force treatment on Carol. Calvert concluded they were not getting anywhere after about 45 minutes, so she gave them both her business card, and told them to call her if one or both of them wanted to continue in some kind of treatment. Calvert did not see either of them again.

Abu-Fakher testified that as a result of the prolonged arguing, he got his handgun around 3 p.m. and tried to shoot himself. He stated that Carol saw him, took the gun from him, and put it in the kitchen cabinet.

Ballard went to the Abu-Fakher residence some time between 3 and 3:30 p.m. He testified that he wanted to be a good listener and a friend, try to work through some of the problems they were having, and impress on them that they needed to separate. Ballard

asked Abu-Fakher about the affair, but Abu-Fakher denied he was having an affair and told Ballard it was strictly professional.

Ballard testified that he witnessed Carol's mood swings and stated she was "very aggressive, very boisterous, very argumentative, extremely physical, argumentative, demanding . . .[and] definitely was in charge of that home at that time . . . ." According to Ballard, Carol was completely out of control. Carol would physically manhandle Abu-Fakher, shoving him around, and would at times put her finger toward his face, causing him to jerk his head out of the way to avoid having his eye poked out. Carol told Ballard that Abu-Fakher was going to leave her and make her "homeless again," and that he would send her back to the "nut house." Ballard tried to act as peacemaker while he was there, but had to leave to attend a meeting around 6:15 p.m.

Around 8 p.m. Monday evening, Saunders spoke with Abu-Fakher again. Saunders testified that he told her "if there were any questions at the office the next morning, to try to maintain that our relationship was professional."

Abu-Fakher stated that Carol left the house around 9 p.m., telling him she was going to the drugstore. Engle testified that Carol came to her house sometime after 8 p.m. on Monday evening. According to Engle, Carol was looking for Ballard at her house because Ballard and Engle were dating. Engle testified that Carol was very emotional and was smoking cigarettes "like crazy." Carol asked for a beer and told Engle to tell Ballard that Abu-Fakher was not the man he thought he was. Carol told Engle something about the car and that Abu-Fakher was having an affair with Saunders. Carol stayed at Engle's house about 20 minutes and then left. According to Abu-Fakher, Carol did not return home for 3 hours.

Abu-Fakher testified that after Carol left, he went upstairs and got his Sony tape recorder and put it in his pocket. He wanted proof of Carol's behavior so others would know what was going on. The tape recorder was voice-activated. Abu-Fakher said he laid down on the sofa and fell asleep.

At approximately 11:45 p.m., Carol telephoned Ballard at home, waking him up. Ballard testified:

"She was very demanding of me. She essentially told me that she wanted me to come over to the house 'right now,' this was going to 'get resolved tonight.' She wanted the car back, she wanted Jamie out of her life, she wanted Romel to tell the truth, and it was going to get resolved tonight or she was going to go tell everybody tomorrow at the office."

Ballard wanted to postpone going to the Abu-Fakher's until morning. After speaking with Carol for about 10 minutes, Carol handed the phone to Abu-Fakher. Ballard testified that he advised Abu-Fakher if he could not get out of the house, to tell Carol whatever he could to pacify her and settle her down for the night. Ballard and Abu-Fakher continued talking as Carol was screaming in the background. Then the phone went dead. Ballard stated that as soon as he got his wits about him he called back, approximately 1 or 2 minutes later. Abu-Fakher answered the phone and told Ballard that Carol had been shot and he needed an ambulance. Ballard instructed Abu-Fakher to hang up and to call 911 and ask for an ambulance.

On September 21, 1999, at 12:41 a.m., an Overland Park police dispatcher received a 911 call from the address of 9900 Metcalf. A man reported that someone had been shot and, in response to the dispatcher's question, indicated that the shooting was accidental. At trial, the dispatcher testified she thought that the caller threatened to shoot himself.

Officers Kathleen Wedel and Michelle Manfield of the Overland Park police went to the 9900 Metcalf address in response to the dispatcher's call. When they arrived, Wedel testified she saw Abu-Fakher in the front yard with his hands in the air. He was holding a cordless phone in his left hand. As the officers approached Abu-Fakher to handcuff him, he yelled that there was a woman dying inside. He used the words woman and wife. Manfield recalled Abu-Faker yelling, "Save my wife." In response to Wedel's questions, Abu-Fakher told the officers the gun was in the house, but that no one but his wife was in the house.

Manfield patted Abu-Fakher down while Wedel handcuffed him. Manfield felt a hard object in his jacket pocket and pulled it out. It was a tape recorder. The red light on the recorder indicated that it was recording. Manfield and Wedel both indicated in their

trial testimony that Abu-Fakher told them to turn the tape recorder back on and stated they might need it for later. Mansfield gave the tape recorder to Wedel and they put Abu-Fakher in a patrol car.

Officer Tom Keary entered the house and found Carol lying on the floor of the foyer just inside the door. Keary noted what appeared to be a gunshot wound on her right side a little below her armpit. When Keary first saw her it appeared to him that Carol might be breathing, but the paramedics informed him that Carol had been dead for some time.

Later, as Keary checked the house for weapons, he observed a black semiautomatic handgun laying on the kitchen counter. The officer found bloodstains on the front door by the bottom hinge, blood spatter on the foyer walls, and a spent 9 millimeter casing on the floor approximately 6 feet from Carol's body. According to Black, there were no indications that a struggle had taken place anywhere else in the house.

Sargent Kim Hulett of the Overland Park Police Department testified that she assisted at the crime scene and then helped pat down Abu-Fakher in the fingerprinting room of the police department. He told her, "I just killed my wife."

Deputy coroner Dr. Michael Handler, a forensic neuropathologist, performed an autopsy on Carol's body. He stated that the cause of death for Carol was "gunshot wound of abdomen and left arm." According to Handler, the bullet entered Carol's right side, traversed the abdominal organs, severed the vena cava, exited her left side, and passed through her left arm, fracturing ribs and her left ulna. He found about 1⅓ quarts of blood in her abdomen, which in his opinion came from the severed vena cava. Handler's findings were consistent with other testing which indicated that the range of fire was within 3 feet, but not in contact with Carol's body.

Abu-Fakher testified that Ballard told him over the phone to leave the house, and he told Ballard he was leaving. He said he went to the kitchen cabinet and got the gun from the kitchen cabinet because Carol had threatened to kill Saunders, and also because he feared Carol would hurt herself. At that point, Carol was sitting on the sofa, apparently still talking on the phone with Ballard. Abu-Fakher said he turned the gun to his own head and

stated, "It is over." According to Abu-Fakher, Carol screamed, "Don, Don, help," and, "He has got a gun." He testified that he did not shoot himself, but instead moved toward the front door. Abu-Fakher testified that she grabbed the gun and screamed at him to stop it. Abu-Fakher told jurors he ran toward the front door to get away from her and she came behind him, trying to block the door with the left side of her body. They argued briefly, and Abu-Fakher told her, "I want to kill you," thinking that would scare her and get her away from him. According to Abu-Fakher, they were both holding the gun, struggling with it, when it went off.

A jury trial was held in the District Court of Johnson County, Kansas. The jury unanimously found Abu-Fakher guilty of the first-degree premeditated murder of Carol. Judge Cleaver sentenced Abu-Fakher to life imprisonment with no parole for 25 years. Here, Abu-Fakher appeals his conviction and sentence.

## I. TAPE RECORDING

The first assertion of Abu-Fakher is that the trial court erred in denying his motion in limine to preclude jurors from hearing the portion of the tape recording containing Carol's dying moans and gasps. According to Abu-Fakher, that portion of the tape was irrelevant, could have been redacted, and its prejudicial effect denied him a fair trial.

The standard of review for a trial court's decision on a motion in limine is abuse of discretion. *State v. Humphery*, 267 Kan. 45, 55, 978 P.2d 264 (1999). "The purpose of a motion in limine is to assure all parties a fair and impartial trial by prohibiting inadmissible evidence, prejudicial statements, and improper questions by counsel." *Brunett v. Albrecht*, 248 Kan. 634, 638, 810 P.2d 276 (1991).

Abu-Fakher does not argue that the tape recording was inaccurate, unauthenticated, or not freely or voluntarily given to police. Abu-Fakher's sole argument is that the portion of the tape containing the dying sounds of Carol constituted irrelevant and cumulative evidence. According to Abu-Fakher, that section of the tape recording is irrelevant and cumulative because the only item of evidentiary value ascertainable from that portion of the tape was

the 911 call, which was available for the jury to hear on a separate tape. According to Abu-Fakher, the portion of the tape which recorded the sounds Carol made as she lay dying could have easily been redacted and served only to inflame the jury. Therefore, he asks this court find that he was denied his right to a fair trial by virtue of the trial court's refusal to limit the admission of that particular portion of the recording.

The State's position is that the trial court did not abuse its discretion by allowing the entire tape recording to come into evidence. The State asserts that (1) the section of the recording in question was material to the State's case in that it corroborated the testimony of a medical expert on cause of death; (2) that the portion of the tape in question had probative value because it captured Abu-Fakher's conversation with Ballard; and (3) that Abu-Fakher's trial counsel invited error by asking jurors to "listen to the tape" during closing argument.

Prior to trial in a motion in limine, Abu-Fakher asked the trial court to declare "inadmissible as gruesome, inflammatory and unduly prejudicial, those portions of the September 21, 1999, audiocassette tape wherein Carol Abu-Fakher is heard moaning and gasping in the background." On the first day of trial when asked about the recording, Judge Cleaver stated that he "found it to be disconcerting and unpleasant to listen to," but that he would have to make a determination as to whether "it rises to the level of being eliminated." On the second day of trial, after defense counsel again brought its motion in limine to the trial court's attention, the trial court stated it would admit the recording in its entirety. At that time, Judge Cleaver stated:

"With respect to the tape, I've had an opportunity to listen to that. I don't see how you can edit it per your request, Mr. Bath. It is so inclusive that I think that it would be impossible to edit. It is not pleasant listening. At the same time, I think that the probative value of that tape outweighs the prejudicial effect, and I will admit it.

. . . .

"When the tape is played, certainly Mr. Ballard can comment on his conversation and what he heard. But with respect to any other comments by third-party witnesses, it would be inappropriate and I'll sustain that on the motion in limine."

Later, Judge Cleaver clarified his intentions regarding the possibility of editing the recording, stating:

"Again, I don't mean to quarrel with you, I don't know that I made a ruling where—what I did was express an approach that I would like to see taken to this and I instructed [the prosecutor] to see if that couldn't be done. But I think I specifically said I was not going to eliminate the tape simply because it was unpleasant and I was willing to listen to editing a tape to eliminate those unpleasant matters that added nothing to the trial. And, [the prosecutor] said he was going to look at that and it's on a CD, I think it could be fairly easily edited.

"It looks to me I need to take a copy of the CD and listen to it so I can respond to your request."

This court has previously observed:

"The purpose for an order in limine is to exclude inadmissible evidence from trial, recognizing that the mere offer of inadmissible evidence at trial can prejudice the jury. [Citation omitted.] A motion in limine should be granted if the trial court finds two factors are present: (1) The material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer of evidence or statements made during trial concerning the material will tend to prejudice the jury. [Citation omitted.]" *State v. Galloway*, 268 Kan. 682, 690, 1 P.3d 844 (2000).

Thus, we must first consider if the portion of the recording to which Abu-Fakher objects would be inadmissible at trial under the rules of evidence. If so, then we next consider whether the mere offer of the recording would tend to prejudice the jury.

"Except as otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. [Citations omitted.] K.S.A. 60-401(b) defines relevant evidence as 'evidence having any tendency in reason to prove any material fact.' " *State v. Leitner*, 272 Kan. 398, 412, 34 P.3d 42 (2001).

A court's determination of relevancy is a matter of logic and experience, not a matter of law. *Leitner*, 272 Kan. at 414 (citing *State v. Gardner*, 264 Kan. 95, 104, 955 P.2d 1199 [1998]). To establish that evidence is relevant to the fact of the crime charged, this court has declared there must be "some natural or logical connection" between the evidence and "the inference or result [it] is designed to establish." *State v. Donesay*, 265 Kan. 60, 85, 959 P.2d 862 (1998).

If the tape recording had no relevance to the crime, it would not be admissible. However, we find that the recording offers proof of the elements of the crime charged, including the fact and manner of Carol's death.

K.S.A. 60-445 provides:

"Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

"While K.S.A. 60-445 only refers to the element of surprise, as a rule of necessity the trial judge may exclude any evidence which may unfairly prejudice the jury. [Citation omitted.] Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. [Citation omitted.]" *Leitner*, 272 Kan. at 415.

Here, Abu-Fakher challenges the trial court's conclusion that the probative value of the objected-to portion of the recording outweighed its prejudicial effect. For authority supporting his position, Abu-Fakher cites *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975). There, this court held that the trial court's admission of autopsy photographs of a body cut open from chin to groin was an abuse of discretion where the cause of death was not in dispute and where the autopsy photographs were unduly repetitious.

In support of its argument, the State cites *State v. Williams*, 235 Kan. 485, 681 P.2d 660 (1984), where the defendant objected to the trial court's admission into evidence of a tape recording of a 30-minute 911 emergency call. The tape recorded a rape victim screaming and crying. On appeal, in addition to challenging that foundation had been properly established, the defendant argued that the recording was so gruesome that its prejudicial effect outweighed its probative value. This court held the argument was meritless and explained:

"The recording went to the very heart of the case showing the victim's lack of consent, that her resistance was overcome by force or fear, and that the sexual assault occurred. The tape also corroborates the testimony of several witnesses, including the victim. The tape is not inadmissible because it is gruesome and shocking. It is a true reproduction of a gruesome, shocking event. The fact the recording reflects this may not be used by appellant to exclude such evidence as

'prejudicial.' It was prejudicial as is all evidence against the accused in criminal actions. That is its purpose. It is only when such prejudicial evidence has little probative value that it is excluded. Here its probative value was strong. The tape recording was properly admitted." *Williams*, 235 Kan. at 493.

After reviewing the CD-Rom reproduction of the tape recording, we conclude that the trial court correctly determined that the probative value of the recording as a whole outweighed any prejudicial impact created as a result of the dying sounds of Carol. As in *Williams*, the recording captured a shocking, gruesome event; however, the probative value of the recording is strong. The tape recording captured the demeanor of the parties involved and changes in the demeanor of Abu-Fakher and Carol before, during, and after the shooting. In addition, the recording not only corroborates the testimony of Abu-Fakher and Ballard concerning their telephone conversation, but provides evidence of the nature and duration of their exchange. The recording is the most probative and comprehensive evidence of the actual commission of the crime, the sequence in which events occurred, and their duration; it provides considerable context for the manner of death and time span in which the events took place.

The trial court did not abuse its discretion by denying Abu-Fakher's motion in limine and admitting the recording in its entirety. Because we find no error, we need not address the State's argument concerning invited error.

## II. AUTOMOBILE

Abu-Fakher's second assertion on appeal is that the trial court abused its discretion in admitting evidence elicited by the State from Jamie Saunders concerning her possession of Abu-Fakher's and Carol's vehicles following Carol's death and his arrest. Abu-Fakher presents a two-part claim of error: (1) He contends the trial court abused its discretion by admitting Saunders' irrelevant and prejudicial testimony, and (2) asserts that the trial court abused its discretion by denying his motion for a mistrial based on Saunders' testimony.

The admission of evidence lies within the sound discretion of the trial court. An appellate court's standard of review regarding a

trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Abu-Fakher's complaints concern the following exchange at trial:

"Q. And why did he loan you the vehicle?

"A. We had a lot of business stuff going on at that point. It was a very busy time, and I had a vehicle that was breaking down frequently and was not being able to get to appointments and to the office when I needed to be there to handle a lot of the business stuff.

"Q. And did you ever get your car fixed?

"A. I did eventually, yes.

"Q. And did you end up giving the Crown Vic back?

"A. Well, all of this stuff happened before my car was repaired. So, no, I mean, I actually have—I still have the Crown Vic in my possession.

"Q. In fact, you've got his Explorer now, too; isn't that correct?

"[COUNSEL FOR ABU-FAKHER]: Objection; relevance.

"THE COURT: Sustained.

"[PROSECUTOR]: It goes to interest.

"THE COURT: Counsel approach.

"(Whereupon, the following proceedings were had at the bench.)

"[PROSECUTOR]: Judge, it goes to the interest and the bias.

"[COUNSEL FOR ABU-FAKHER]: Interest and bias as to what? She confirmed the affair. That was really the only issue in question. The rest is just sleeze to try to throw mud on my client. I've let him go a long way, but he's established everything that he needed to establish.

"THE COURT: You may inquire. I'll overrule the objection.

(Whereupon, the proceedings continued in open court as follows.)

"Q. (By [Prosecutor]) Ms. Saunders, in fact, you are in possession of the defendant's Explorer now as well; correct?

"[COUNSEL FOR ABU-FAKHER]: Objection; leading.

"THE COURT: Sustained.

"Q. (By [Prosecutor]) Do you have any other vehicles that belong to any of the parties in this case today?

"A. Yes, I do.

"Q. What?

"A. I have the Ford Explorer and I also have possession of the Mustang.

"Q. And whose car was the Mustang?

"[COUNSEL FOR ABU-FAKHER]: Relevance.

"[PROSECUTOR]: Same. My response would be the same.

"THE COURT: Overruled.

"A. I believe the Mustang was Carol's.

"Q. (By [Prosecutor]) What happened to the Crown Vic?

"A. I still have it.

"[COUNSEL FOR ABU-FAKHER]: Objection; relevance.

"THE COURT: Overruled.

"Q. (By [Prosecutor]) So you've got all three?

"A. I do.

"Q. Do you have anything else that belonged to Carol Abu-Fakher?

"[COUNSEL FOR ABU-FAKHER]: Objection; relevance. Approach?

"THE COURT: Sustained.

"(Whereupon, the following proceedings were had at the bench.)

"[COUNSEL FOR ABU-FAKHER]: I'm going to start moving for a mistrial. [The Prosecutor], I think, is taking it way too far. I'm going to move for a mistrial over the prejudicial information that he is dumping into the case.

"[PROSECUTOR]: Judge, I don't know how to respond to that. I think —

"THE COURT: I understand. Noted. Overruled."

Abu-Fakher argues that the testimony elicited was irrelevant and contends that jurors could draw prohibited inferences from the admission of this evidence. Abu-Fakher contends jurors could infer that Saunders exploited Carol's death, that she had a bad character, or that Saunders and he were involved in a plan to get rid of Carol.

The State's position is that the questions were properly designed to explore the bias and partiality of Saunders. The State asserts that under K.S.A. 60-420 and Kansas case law, the prosecutor properly employed cross-examination to expose Saunders' possible bias and motivation.

"The trial court has discretion to allow evidence to be admitted in the least prejudicial manner to show possible bias on the part of a witness." *State v. Wesson*, 247 Kan. 639, Syl. ¶ 7, 802 P.2d 574 (1990). The exposure of a witness' motivation in testifying is a proper and important function of cross examination. *Davis v. Alaska*, 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974); *State v. Davis*, 256 Kan. 1, 15-16, 883 P.2d 735 (1994); *State v. Bowen*, 254 Kan. 618, Syl. ¶ 6, 867 P.2d 1024 (1994). "A witness can be questioned about possible bias and motivation for testifying regardless of the scope of the direct examination." *State v. Jacques*, 270 Kan. 173, 181-82, 14 P.3d 409 (2000). "Bias, interest, or improper motives of a witness may always be shown in order

to place the witness' testimony in proper perspective." *State v. Bowman*, 252 Kan. 883, Syl. ¶ 1, 850 P.2d 236 (1993).

We find that the trial court did not abuse its discretion in admitting the testimony concerning Saunders' possession of Abu-Fakher's vehicles following his arrest and through the time of trial. The testimony elicited from Saunders illustrates a continuing and presumably favorable relationship with Abu-Fakher, as well as a possible dependence on his good graces to ensure her the use of his vehicles. The testimony elicited demonstrating the continuing arrangement between Abu-Fakher and Saunders might, in turn, indicate that Saunders' testimony was biased or slanted in favor of Abu-Fakher.

The second part of Abu-Fakher's argument concerning Saunders' testimony concerning her possession of Abu-Fakher's and Carol's vehicles is that the trial court abused its discretion by denying his motion for a mistrial. Abu-Fakher contends the denial of his motion for mistrial resulted in substantial prejudice to him and denied him a fair trial.

"A decision on a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal absent a clear showing of abuse of discretion. [Citations omitted.] The defendant has the burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court. [Citation omitted.]" *State v. Manning*, 270 Kan. 674, 696, 19 P.3d 84 (2001).

Abu-Fakher argues that allowing the introduction of evidence that Saunders had continued possession of his vehicles led the jury to infer he was guilty of premeditated murder. He argues that this evidence allowed members of the jury to speculate that Abu-Fakher and Saunders were involved in a plan to kill or get rid of Carol. In support, Abu-Fakher cites *State v. Massey*, 242 Kan. 252, 265, 747 P.2d 802 (1987).

In *Massey*, one of the State's witnesses violated an order in limine by testifying before the jury that a bedspread which had covered the victim appeared to have a bullet hole through it. The defendant argued that "the trial court should have granted a mistrial under K.S.A. 22-3423(1)(c), which provides a court may grant a mistrial when prejudicial conduct makes it impossible to proceed without injustice to the defendant." 242 Kan. at 264. This court

concluded that the evidence was inadmissible and that the witness' violation of the order in limine was prejudicial to the defendant. Therefore, the *Massey* court reversed the judgment of the trial court and granted defendant a new trial.

The State contends that *Massey* is inapplicable because its facts are dissimilar to the facts here. In addition, the State argues that the question that prompted Abu-Fakher's motion for mistrial went unanswered because the trial court sustained defense counsel's objection. Therefore, the State contends that Abu-Fakher fails to demonstrate any prejudice.

We agree. Here, the trial court sustained the objection of defense counsel and the final question went unanswered. At that point, the preceding testimony concerning Saunders' possession of Abu-Fakher's vehicles illustrated the witness' possible bias, and its admission was not in error. Because Abu-Fakher has not met his burden of showing substantial prejudice by virtue of the trial court's admission of Saunders' testimony, we hold that the trial court did not abuse its discretion in denying Abu-Fakher's motion for a mistrial.

### III. VOLUNTARY MANSLAUGHTER INSTRUCTION

Next, Abu-Fakher challenges the trial court's instruction to the jury on the lesser included offense of voluntary manslaughter. Abu-Fakher maintains that the instruction on voluntary manslaughter adversely affected the jury's deliberative process, rendering it unable to give effect to mitigating evidence and, therefore, he requests a reversal of his conviction.

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000).

Abu-Fakher contends that the trial court committed error by failing to pattern its jury instruction solely after PIK Crim. 3d 56.05(B) (1999 Supp.). Citing the Notes on Use from PIK Crim. 3d 56.05, Abu-Fakher maintains that the elements instructions set

forth in alternative A of 56.05 should be used when the information charges the defendant with voluntary manslaughter, but that alternative B should be used when voluntary manslaughter is submitted as a lesser-included offense of the crime charged. According to Abu-Fakher, the jury was instructed on both alternatives, rendering alternative B meaningless.

Abu-Fakher acknowledges, however, that defense counsel did not object to the trial court's voluntary manslaughter instruction to the jury. Therefore, he concedes that as a consequence, this court must review the instructions under a clearly erroneous standard.

Our standard of review, when considering whether a jury instruction should have been given, is governed by K.S.A. 2001 Supp. 22-3414(3), which states, in pertinent part:

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or failure to give an instruction is clearly erroneous."

"Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]" *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001).

In this case, the assistant district attorney charged Abu-Fakher with one count of premeditated murder in the first degree. The State did not file alternative charges against him.

The trial court instructed the jury on first-degree murder. In addition, the record reveals that the jury was instructed on the lesser-included offenses of intentional murder in the second degree, unintentional murder in the second degree, voluntary manslaughter, and involuntary manslaughter. Jurors were also instructed that "[w]hen there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only." In addition, the jury was provided with definitions of the terms "premeditation," "willfully," "intentionally," "heat of passion," and "reckless."

Abu-Fakher claims that Instruction No. 12, the instruction given on voluntary manslaughter, was clearly erroneous. That instruction stated:

"In determining whether the defendant is guilty of intentional or unintentional murder in the second degree, you should also consider the lesser offense of voluntary manslaughter. Voluntary manslaughter is an intentional killing done upon a sudden quarrel or in the heat of passion or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person.

"If you decide the defendant intentionally killed Carol Abufakher, but that it was done upon a sudden quarrel or in the heat of passion or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person, the defendant may be convicted of voluntary manslaughter only.

"To establish this charge, each of the following charges *must be proved*:

"1. That the defendant intentionally killed Carol Abufakher;

"2. That it was done upon a sudden quarrel or in the heat of passion or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person.

"3. That this act occurred on or about the 21st day of September, 1999 in Johnson County, Kansas." (Emphasis added.)

PIK Crim. 3d 56.05 is the pattern instruction for voluntary manslaughter. The Notes on Use of PIK Crim. 3d 56.05 state that "[i]f the information charges voluntary manslaughter, use alternative A. When voluntary manslaughter is submitted to the jury as a lesser offense of the crime charged under K.S.A. 21-3107(2)(a), use alternative B." Here, the trial court fashioned Instruction No. 12 using alternative B and then appended alternative B with that portion of alternative A which sets forth the required elements of voluntary manslaughter.

Abu-Fakher insists that the instruction on voluntary manslaughter improperly shifted the burden to him to prove mitigating circumstances. Abu-Fakher maintains that when a defendant is charged with intentional murder and there is evidence that the killing was committed upon a sudden quarrel or in the heat of passion, the jury must be instructed that "heat of passion" or "sudden quarrel" are not elements the defendant must prove beyond a reasonable doubt, but rather are mitigating circumstances akin to the concept of self-defense. Here, he contends that trial court's instruction to the jury on voluntary manslaughter was erroneous as

a matter of law in that it required these mitigating circumstances to be proven beyond a reasonable doubt. In support, Abu-Fakher cites *State v. McCown*, 264 Kan. 655, 665, 957 P.2d 401 (1998); *State v. Cribbs*, 29 Kan. App. 2d 919, 34 P.3d 76 (2001); and *State v. Harris*, 27 Kan. App. 2d 41, 45-46, 998 P.2d 524 (2000).

The State claims that because the jury convicted Abu-Fakher of first-degree murder, it did not need to consider the lesser included offenses of second-degree murder, voluntary manslaughter, or involuntary manslaughter. The State additionally asserts that the language of the voluntary manslaughter instruction accurately stated the elements and was not clearly erroneous.

The question presented is whether this court is convinced the jury would have rendered a different verdict if the trial court had instructed jurors using an unamended version of alternative B of PIK Crim. 3d 56.05, *i.e.*, without adding the elements section of alternative A.

"Generally speaking, it is the duty of the trial judge, under K.S.A. 22-3414, to define the offense charged and state to the jury the essential elements of the crime, either in the language of the statute or in appropriate and accurate words of his own. [Citations omitted.]" *State v. Miller*, 222 Kan. 405, 415 565 P.2d 228 (1977).

In *State v. Wilson*, 240 Kan. 606, 731 P.2d 306 (1987), this court reversed the defendant's conviction of murder in the second degree, finding that the case had proceeded to trial on a fatally defective information which failed to set forth the elements of murder in the first degree. After setting aside the defendant's conviction due to that jurisdictional defect, this court further commented on the trial court's troublesome instruction on voluntary manslaughter.

In *Wilson*, the trial court's instruction on voluntary manslaughter contained several changes from the pattern instruction of PIK Crim. 2d 56.05. Over the objections of the prosecutor and defense counsel, the trial court inserted the element of "without malice" in the instruction on voluntary manslaughter. 240 Kan. at 609. This court stated that "[w]hile the trial court was correct in its statement that voluntary manslaughter is a killing without malice, this instruc-

tion as given, considered in the light of the other instructions, was confusing." 240 Kan. at 609.

In addition, this court in *Wilson* found the trial court's instruction on the defense of self-defense unclear, due to the fact that the trial court deleted the sentence: " 'The State's burden of proof does not shift to the defendant.' " 240 Kan. at 609. This court stated that "[t]he instruction as given thus lacked the clarity of the original PIK instruction and did not warn the jury that when this defense is raised, the State's burden of proof does not shift to the defendant." 240 Kan. at 609. In *Wilson*, this court admonished trial courts to employ pattern jury instructions when appropriate, "unless there is some compelling and articulable reason not to do so." 240 Kan. at 610.

Abu-Fakher cites *McCown* and *Harris* as authority for the proposition that the elements of "heat of passion" or "sudden quarrel" are mitigating circumstances which the defendant need not prove at trial. According to Abu-Fakher, the State does not bear the burden of proving the nonexistence of such mitigating circumstances and, likewise, a defendant is not required to establish mitigating circumstances by a preponderance of the evidence.

In *McCown*, the defendant was charged with the first-degree murder of his roommate's stepfather who had suffered 97 bruises, abrasions, lacerations, and stab wounds. The trial court instructed the jury on first-degree murder and on six lesser included offenses, including intentional second-degree murder. On appeal, McCown challenged the jury instruction on intentional second-degree murder given by the trial court because it did not include the element of malice and claimed that without the element of malice, the intentional second-degree murder statute criminalized homicide committed in self-defense. This court concluded that, due to a 1993 amendment to the statute, second-degree intentional murder no longer included the element of malice. In addition, this court found the burden-shifting argument of defendant to be without merit. There, we stated:

"In Kansas, we recognize affirmative defenses. However, unlike the New York statute . . ., we do not require a defendant to establish his or her defense by a preponderance of evidence. Once evidence of self-defense or evidence that the

defendant acted with lesser culpability has been raised, the trial court is bound to instruct the jury on self-defense and any lesser included offense raised by the evidence. It is then up to the jury to resolve the question of guilt upon the charged crime. [Citations omitted.]" *McCown*, 264 Kan. at 663.

"Much like our state, the New York statute at issue in [*State v.*]*Patterson* [262 Kan. 481, 939 P.2d 909 (1997)] defined second-degree murder as intentionally killing another person. However, New York, unlike Kansas, required mitigation in the form of extreme emotional disturbance to be raised and established by the defendant by a preponderance of evidence. In Kansas, once evidence of self-defense or other defenses lessening culpability is admitted, the trial court is bound to instruct the jury on the defense or on lesser included offenses raised by such evidence. Failure to do so may result in reversible error and the granting of a new trial. The State, according to standard instructions, must nevertheless prove all elements of the crime by evidence beyond a reasonable doubt. This burden does not require the State to prove the nonexistence of mitigating circumstances . . . ." *McCown*, 264 Kan. at 665.

## In *Harris*, our Court of Appeals adopted the rule that

"where a defendant is charged with murder and is convicted of the lesser included offense of manslaughter, the defendant's conviction will stand notwithstanding the fact that there was no evidence to support the jury's finding of provocation, as long as the evidence was sufficient to convict the defendant of the greater crime of murder." 27 Kan. App. 2d at 45.

## The Court of Appeals held:

"[W]here a defendant is charged with second-degree intentional murder and convicted of voluntary manslaughter based on sudden quarrel or heat of passion, the conviction may stand even absent evidence of sudden quarrel or heat of passion, as long as the evidence was sufficient to convict the defendant of second-degree intentional murder. The sole distinction between intentional second-degree murder and voluntary manslaughter in this case was the presence of mitigating circumstances. The jury, by its conviction for voluntary manslaughter, clearly found that Harris had intentionally killed Garrett. However, the jury, without evidence, decided to find mitigating circumstances. Such a result is favorable to Harris and, thus, he may not complain on appeal that his conviction for voluntary manslaughter was based on insufficient evidence as long as sufficient evidence existed to convict him of the greater offense of second-degree murder." 27 Kan. App. 2d at 46-47.

Thus, under *Harris* and *McCown*, in the context of lesser included offenses, neither the State nor the defendant is required to prove mitigation beyond a reasonable doubt.

*Cribbs*, 29 Kan. App. 2d 919, is distinguishable on its facts from this case. There, defendant Cribbs appealed his conviction of attempted second-degree murder, arguing that the trial court committed clear error in instructing the jury on voluntary manslaughter based on alternative A of PIK Crim. 3d 56.05. Our Court of Appeals found that alternative B would have instructed jurors to consider convicting defendant on the lesser included offense of voluntary manslaughter as jurors deliberated on the attempted second-degree murder charge, but that alternative A precluded jurors from considering attempted voluntary manslaughter "unless and until it failed to agree on his guilt of attempted second-degree murder." 29 Kan. App. 2d at 924. The *Cribbs* court found that members of the jury "may never have fully analyzed whether the shooting was the product of heat of passion or a sudden quarrel, the factors that distinguish the greater and the lesser crimes and the reasons they require simultaneous deliberation when the evidence could support either." 29 Kan. App. 2d at 924. Limiting its holding to the facts of that particular case, the Court of Appeals found the instruction clearly erroneous and reversed the defendant's second-degree murder conviction.

In *State v. Dixon*, 252 Kan. 39, 843 P.2d 182 (1992), the complaint charged defendant Dixon in the alternative with attempted first-degree murder or aggravated battery. Dixon was convicted of attempted first-degree murder. On appeal, Dixon challenged the trial court's instruction to jurors that they need not consider whether he was guilty of aggravated battery if they found him guilty of attempted first-degree murder. Relying on *State v. DeHerrera*, 251 Kan. 143, 834 P.2d 918 (1992), this court held that it was not necessary for the jury to consider the alternative charge once jurors decided that Dixon was guilty of attempted first-degree murder. There, this court stated:

"In the lesser included offense instruction the jury is directed to consider the offenses in descending order of severity because the greater (or greatest) offense is the one with which defendant has been charged. If the evidence, principally the State's evidence, establishes beyond a reasonable doubt the defendant's guilt of the charged offense, the case is over." *Dixon*, 252 Kan. at 49.

In this case, the instruction did not preclude the jury from considering convicting Abu-Fakher of voluntary manslaughter. To the contrary, it instructed jurors that "[i]n determining whether the defendant is guilty of intentional or unintentional murder in the second degree, you should also consider the lesser offense of voluntary manslaughter." While the instruction on voluntary manslaughter may have lacked clarity, it did not state that the defendant had to prove the mitigating elements. On the contrary, another instruction indicated that "[t]he State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless and until you are convinced from the evidence that he is guilty."

The jury found Abu-Fakher guilty of premeditation, which is a finding inapposite to the mitigating circumstances of "heat of passion" or "sudden quarrel." While the words "must be proved" should not have been included in the instruction given to the jury, this error does not reach the level of clear error required by K.S.A. 2001 Supp. 22-3414.

## IV. MISCONDUCT

For his next assertion of error, Abu-Fakher claims that the prosecutor committed misconduct during trial and in closing argument which, separately and cumulatively, was of such a magnitude as to deny him his right to a fair trial. Abu-Fakher concedes that his trial counsel did not object to the statements of the prosecutor at issue.

"If a claimed error of prosecutorial misconduct implicates a defendant's right to a fair trial, the appellate standard of review is the same regardless of whether the issue of prosecutorial misconduct is preserved by an objection at trial." *State v. Doyle*, 272 Kan. 1157, Syl. ¶ 4, 38 P.3d 650 (2002).

"If a claimed error of prosecutorial misconduct rises to the level of a denial of the Fourteenth Amendment right to due process, the issue of prosecutorial misconduct will be addressed. The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, an appellate court determines whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, an appellate court must determine whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal." *Doyle*, 272 Kan. 1157, Syl. ¶ 5.

Abu-Fakher claims that the prosecutor (1) misstated the law on premeditation and intent; (2) gave his personal opinion of the credibility of witnesses; and (3) expressed ill will toward him by mocking his accent during cross-examination. We will examine each claim in turn.

1. Comments on premeditation

Abu-Fakher contends that the prosecutor misstated the law and usurped the jury's function by informing the jury in closing argument that if he shot his wife on purpose it was premeditation. Abu-Fakher complains of the following statement of the prosecutor:

"The instructions, first-degree murder, intentional killing. One of the few things that the defendant agreed with is that, 'If you shoot somebody in the chest, you mean to kill them,' 'done with premeditation.'

"The instructions, I think that it is No. 14, 'premeditation,' will tell you, quote, 'To think a matter over beforehand.' And that is a quote. It doesn't mean days, doesn't mean weeks, doesn't mean months. It can be seconds. And in of this case, it was several seconds. There was plenty of time for the defendant to decide, 'I'm going to kill you' and then do it about thirty seconds or so later. Time it. Time it when you are back there.

"You'll also be instructed on the range of other lesser offenses, less serious offenses, second degree, intentional. That is killing somebody intentionally without premeditation. *Well, if you believe he killed her on purpose, that is premeditated.*" (Emphasis added.)

It is clear that the final comment of the prosecutor incorrectly stated the law on premeditation. An intentional killing alone does not establish the element of premeditation. "Premeditation, as it relates to a homicide, is the process of thinking about a proposed killing before engaging in the homicidal conduct. Premeditation is a state of mind." *State v. Parker*, 273 Kan. 56, Syl. ¶ 3, 41 P.3d 789 (2002).

Although the statement was improper, it does not rise to the level of being gross or flagrant in the context of the previous statement of the prosecutor reading the definition of premeditation. The effect of this misstatement alone did not compromise Abu-Fakher's right to a fair trial.

2. Statements concerning witnesses' credibility

Abu-Fakher also complains that during closing argument, the prosecutor characterized him as a liar and personally vouched for

the credibility of Whitley and Jackson. Abu-Fakher contends that the prosecutor's prejudicial characterization of him was an improper burden-shifting comment. According to Abu-Fakher, the prosecutor's expression of his personal opinion concerning the truth or falsity of any testimony violates the rules of professional conduct.

During closing argument, the prosecutor made the following statements:

"And that is why that first line is so very important where it says, 'It is for you to determine the weight and credit to be given the testimony of each witness.'

"What that means is that, if you don't believe somebody, you don't believe somebody, you don't have to give what they say any weight. You can completely throw it out if you want. And I think there are some witnesses in this case, particularly the defendant, whose testimony that you should give little, if any, weight to. And we'll talk about that some more later.

"Let's talk about some of the other witnesses, though, when you look at this weighing, how much credit you are going to give what this witness said.

"The defendant: I'd submit to you, very little. There is a guy who won't even admit to you that he lied to his wife. He can't even get that far. He can't even admit to you that it was wrong to do what he was doing with Jamie Saunders. What do you think he is going to do when it comes to telling you whether or not he is responsible for a homicide? I'd say, 'No credit.' "

The prosecutor further stated:

"And then you've got your other people in this case. You've got Sharon Whitley, Jesse Jackson. I submit to you that they told you it like it is. A couple of country people up here trying to rekindle a relationship with a sister who has lived across the continent from them for many, many years.

"I think that Sharon Whitley told you the good, the bad, and the ugly about Carol. 'Yeah, she had mental problems at times in her life. Yep, she was loud. Yep, she could be obnoxious. But she was also a lot of fun and she had a nice side to her. Yep, she was on his back that day.' We know that is true. Wouldn't you be, though? Is that crazy or is that normal? I think that it is normal.

"Jesse Jackson, another guy that I think is telling you the truth, the evidence, the weight of the evidence. What did he say that the defendant said to him right before that call on Monday when he got hung up on? When the cussing is going on, tempers are flaring, what does he say to Jesse Jackson? 'I'm going to kill her and kill myself.' I suspect, ladies and gentlemen, that might very well be why that tape is rolling in his pocket."

The State maintains that the prosecutor told the jury that counsel's arguments were not evidence and to disregard statements of counsel

that were not in evidence. According to the State, the prosecutor's statement to the jury that it should give very little credit to what Abu-Fakher said was based upon the evidence. The State points out that when asked if he had lied about the affair with Saunders, Abu-Fakher testified, "It is—it is not considered 'lying.' "

As for the prosecutor's comments on the credibility of Whitley and Jackson, the State maintains that the prosecutor's statements did not reflect the prosecutor's knowledge of the witnesses' veracity and were not improper under *State v. Finley*, 273 Kan. 237, 42 P.3d 723 (2002). The State contends that the prosecutor's comments were not so inflammatory as to deny Abu-Fakher a fair trial.

In *Finley*, in closing argument the prosecutor told the jury: " 'And don't forget all the inconsistencies that I pointed out in Tom's prior sworn testimony. He's said various things at various times, and the reason why people do that is because they can't keep all the lies straight.' " 273 Kan. at 246. There, we reviewed *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000), and found:

" 'Pabst's credibility was crucial to the case. The prosecutor placed before the jury unsworn testimony which it should not have considered: his personal opinion on Pabst's credibility and the credibility of the State's evidence. Stating facts not in evidence is clearly improper. [Citation omitted.] Accusing Pabst of lying goes far beyond the traditional wide latitude afforded to prosecutors in closing argument. [Citation omitted.] Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence. When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on the evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury.'

"The *Pabst* court reversed the conviction based on the prosecutor's having injected his personal opinion about the credibility of the defendant. 268 Kan. at 510-12.

"The prosecutor's argument in the present case was not improper. The prosecutor based her argument on an inference drawn from the nature of the defendant's conflicting stories, not on the prosecutor's knowledge of the defendant's veracity. Furthermore, the phrase, 'they can't keep all the lies straight' does not come close to the egregious manner in which the prosecutor in *Pabst* called the defendant a liar. See 268 Kan. at 505-06. As the comment purported to be based on evidence, not on the prosecutor's personal knowledge of the defendant's veracity, it cannot be said the prosecutor's comment denied the defendant a fair trial." *Finley*, 273 Kan. at 246.

Here, the prosecutor's comments on the weight to be given to Abu-Fakher's testimony and the prosecutor's statements concerning the credibility of Whitley and Jackson cannot be equated with the prosecutor's statements in *Finley*. The statements of the prosecutor in this case are clearly outside the considerable latitude the prosecutor is allowed in discussing the evidence in that they invade the province of the jury.

Having decided that these comments fall outside of the scope of permissible argument, we must consider the second prong of the test for prosecutorial misconduct.

" 'Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial.' [Citations omitted.]

" ' "Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error.' " [Citations omitted.] 'Specifically, "[i]n deciding the question of whether prosecutorial misconduct requires reversal, an appellate court determines whether there was little or no likelihood the error changed the result of the trial." ' [Citation omitted.]" *State v. Navarro*, 272 Kan. 573, 584, 35 P.3d 802 (2001).

In *Pabst*, the defendant testified that during an argument with his fiancé he retrieved a revolver from his truck, handed it to her, and told her to shoot him if she thought he was so worthless. According to the defendant, they struggled over the gun when it went off, fatally shooting the defendant's fiancé. There, this court found Pabst's credibility was crucial to the case and that the prosecutor's improper comments denied him a fair trial by unfairly prejudicing the jury against him.

We hold there was little or no likelihood that the prosecutor's instructions to the jury to give no weight to Abu-Fakher's testimony, while bolstering the credibility of the State's witnesses who testified that Carol was not acting mentally ill, would change the result of the trial.

3. Imitation of Abu-Fakher's statement on the tape recording

During the State's cross-examination of Abu-Fakher, the prosecutor questioned Abu-Fakher about the details of the conversations captured on the tape recording. Abu-Fakher contends that

during the following portion of his cross-examination, the prosecutor expressed ill will toward him by mocking his accent:

"Q. (By [the prosecutor]) And then a few minutes later, about five minutes later into that call, when you are on the phone with Mr. Ballard, you begin to—Carol is still in the background yelling things, isn't she?

"A. Yes.

"Q. She is still griping and being on your back about things; right?

"A. Yes.

"Q. And then one of the things she has been griping about, as we all know, is Jamie; right?

"A. Yes.

"Q. And the car?

"A. Yes.

"Q. And then Mr. Abu-Fakher, you begin to mock her, don't you?

"A. 'Mock her'? What mean?

"Q. Making fun of her, don't you?

"A. I never make fun of anybody.

"Q. You don't? You say, 'Oh, I have ten girl friends. I have hundred good friends. If I had a girlfriend, I have ten. How many you want? Ten, twenty?'

"[COUNSEL FOR ABU-FAKHER]: I think [the prosecutor] is mocking Mr. Abu-Fakher, making fun of his race and I don't appreciate it. I object to that.

"THE COURT: Counsel, make an objection. Just do the objection.

"[COUNSEL FOR ABU-FAKHER]: I object to [the prosecutor's] conduct; inappropriate.

"THE COURT: I think that you can read the question without—

"[THE PROSECUTOR]: I'll try to, Judge.

"Q. (By [the prosecutor]) Is that true?

"A. Mr. Ballard asked me to tell her what she like to hear."

The State claims that the prosecutor was asking the question using the same tone that Abu-Fakher invoked during his tape-recorded argument with Carol. While this is not a clear admission, it is certainly not a denial that the conduct took place. Defense counsel objected to the prosecutor's conduct as improperly "mocking Mr. Abu-Fakher, making fun of his race." According to the State, the trial court sustained defense counsel's objection and, thus, no reversible error occurred.

In *State v. Smith*, 258 Kan. 321, 323, 904 P.2d 999 (1995), as the prosecutor cross-examined Smith, he asked, "Is that the same Bible that says 'Thou shalt not kill'?" Because defense counsel's contemporaneous objections was sustained, this court did not find

reversible error. "It is well established that an appellate court will not find reversible error when an objection to a prosecutor's question or statement has been sustained." 258 Kan. at 321, Syl. ¶ 3.

The United States Supreme Court has observed that, "[l]ike the Hydra slain by Hercules, prosecutorial misconduct has many heads." *United States v. Williams*, 504 U.S. 36, 60, 118 L. Ed. 2d 352, 112 S. Ct. 1735 (1992).

"A prosecutor is a servant of the law and a representative of the people. . . . Sixty-five years ago the United States Supreme Court said that the prosecutor represents

'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)." *Pabst*, 268 Kan. at 510.

The *Berger* court further observed that a prosecutor

"may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 2d 1314, 55 S. Ct. 629 (1935).

In this case, the State does not deny that the prosecutor may have imitated Abu-Fakher's accent when cross-examining him. The trial court's decision to sustain the defense counsel's objection shows that the conduct of the prosecutor overstepped the bounds of propriety by mimicking Abu-Fakher's foreign accent. The prosecutor expressed ill will toward Abu-Fakher by his actions.

The objection of defense counsel was sustained, and the trial court admonished the prosecutor to discontinue the conduct giving rise to the objection. We do not find reversible error.

## V. SPECIFIC PRIOR INSTANCES OF CONDUCT

For his final assertion of error, Abu-Fakher claims the trial court abused its discretion by allowing the prosecutor to improperly attack his character while eliciting his testimony during cross-examination. Abu-Fakher contends that the admission of this evidence resulted in a denial of his fundamental right to a fair trial, requiring a reversal of his conviction.

"The admissibility of evidence lies within the sound discretion of the trial court. . . . ' "[I]t is clear that our standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion." ' " *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Abu-Fakher complains that during his cross-examination, the prosecutor attacked his character by questioning him (1) about a restraining order he obtained in Florida against Carol in 1997; (2) about finding Carol on the streets sunburned, dehydrated, and blisters on her feet; and (3) about a petition for divorce which stated he was financially dependent on Carol and required alimony, exclusive use of the home, and payment of insurance, and requested that he be named beneficiary of Carol's life insurance. Abu-Fakher concedes that his trial counsel failed to lodge a contemporaneous objection to the prosecutor's cross-examination. He argues, however, that his character was not at issue and the prosecutor's elicitation of these specific instances of conduct was, thus, impermissible.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404. "It is well settled that a timely and specific objection to the admission of evidence at trial must be made in order to preserve that issue for appeal. [Citation omitted.]" *State v. Barksdale*, 266 Kan. 498, 511, 973 P.2d 165 (1999).

Here, defense counsel's failure to object to the admission of Abu-Fakher's testimony on cross-examination precludes appellate review. See *State v. Valdez*, 266 Kan. 774, 789, 977 P.2d 242 (1999) (stating that although defendant objected at trial to the admission of a DNA report based on chain of custody, the lack of a trial objection to the admission of the report based on the number and preparation of the swabs precluded this court's review); *State v. Cellier*, 263 Kan. 54, 64-65, 948 P.2d 616 (1997) (finding that the failure to file a contemporaneous objection to admission of defendant's confession ruled out appellate review). Abu-Fakher has failed to preserve this issue for appeal.

Affirmed.

LARSON, S.J., assigned.