No. 93,430

STATE OF KANSAS, *Appellee*, v. RICHARD R. REED, *Appellant*.

144 P.3d 677

Opinion filed October 27, 2006.

*B. Joyce Yeager*, special counsel, argued the cause, and *Virginia A. Girard*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Larry Markle*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Richard Reed appeals his convictions of first-degree premeditated murder of his wife; attempted second-degree murder of his daughter, R.R.; and aggravated burglary. He argues the district court erred in denying his motion for change of judge and in admitting the audiotape of a 911 call that Reed believes was cumulative evidence and unduly prejudicial. Reed also appeals his hard 50 sentence, arguing the hard 50 sentencing scheme is unconstitutional. We reject his arguments and affirm his convictions and sentences.

## FACTS

During the evening of December 23, 2001, Reed and his wife Shirley had argued over the telephone. Shirley had recently filed for divorce and Reed was upset because of the breakup and Shirley's relationship with another man. That night, Shirley and the couple's oldest daughter, R.R., fell asleep on sofas in the living room of a house into which they were moving; the house was located in Cedar Vale, Kansas. The couple's two younger daughters were visiting Reed.

Around 4 a.m. on December 24, 2001, Reed entered the house in Cedar Vale by breaking the glass in a door. He then embarked on a shooting rampage which left Shirley dead and R.R. wounded. Upon entering the living room, Reed shot Shirley as she sat up on the sofa. Although wounded, Shirley escaped from the room. She called 911 and remained on the line during most of the incident. R.R. also grabbed a nearby phone, dialed 911, set the phone down, and then tried to escape. Reed shot R.R., causing her to fall to the floor. Reed told her to get up, but she could not do so. Around this time, R.R. saw Reed change clips in the gun and recognized the gun as one Reed collected. R.R. testified that Reed "held the gun over" her and yelled to Shirley that if she did not come out, he would kill R.R. While lying on the floor, R.R. saw her father walk toward the hallway, kitchen, and bedroom area of the house and heard him swearing and yelling for her mother to "Get out here." R.R. vaguely remembered hearing gunshots or footsteps.

Before leaving the house, Reed came back to R.R. and shot her in the chest.

Because of the open phone line, much of what occurred was heard by Janet Waller, a 911 dispatcher for Chautauqua County, Kansas. Waller testified that she received a call at approximately 4 a.m. on December 24, 2001, that originated from the Cedar Vale address. Waller initially heard screams and then someone said that a shooting was taking place and that the police were needed. Waller immediately called police and sheriff's officers and then returned to the 911 call. She heard a man's voice screaming and yelling at a female other than the caller. Waller recognized the voice as Reed's. Waller testified that, while Reed was screaming, the caller was repeatedly whispering, "Please help me." Waller then heard gunshots, and the phone went silent.

When officers arrived at the scene, they found R.R. alive on the porch where she had collapsed after her father left the house. Shirley's body was found on the floor in the closet in the middle downstairs bedroom. She was lying face down, with her knees curled into a fetal position. A telephone was discovered under her right hand. Bloodstain impact patterns in the closet indicated Shirley received a minimum of three gunshot wounds while in the closet. There also were bloodstains from the living room to the bedroom indicating Shirley had moved through the house after being wounded and had suffered some type of impact at various locations in the house.

The autopsy report indicated that Shirley received 20 gunshot wounds: 1 graze-type gunshot wound to her nose, 12 perforated gunshot wounds to her chest and abdominal areas, 5 defensive-type gunshot wounds to her upper extremities, 1 graze-type gunshot wound to her left thigh, and 1 perforated gunshot wound to her left thigh. She also had contusions on her lower extremities.

After the shooting, Sheriff Frank Green passed a silver Ford Ranger pickup truck matching the description of the vehicle driven by Reed. As Green hit his brakes, the pickup truck pulled over to the shoulder. Reed got out of the truck and put his hands up and back down again. Green asked him: "Are you who I'm looking for?" Reed responded: "If you're referring to the shooting in Cedar Vale,

I guess I am." Sheriff Green told Reed to lie down and put his hands behind his back. Then, Green placed him in handcuffs and *Mirandized* him. Reed then stated: "I'm not going to give you any trouble. I've already killed who I wanted to kill."

In the squad car on the way to the county jail, Reed began volunteering details about the events surrounding the shooting incident. According to Reed, he shot his wife because she was having an affair, and he shot R.R. as a "reflex." After the booking process was complete at the jail, Green informed Reed, again, of his *Miranda* rights and obtained his permission to interview him on audio and videotape. During the interview, Reed indicated that he had suspected Shirley was having an affair with a man in Texas. Reed told Green that about an hour before he drove to Cedar Vale, he decided that his children would be better off if Shirley were dead. According to Reed, he had planned to kill Shirley and then himself, but he ran out of bullets. Reed admitted to drinking a few beers on his way from Elk City, Kansas, to Cedar Vale, but Sheriff Green testified that Reed did not seem drunk or impaired during the interview.

Reed testified in his own defense. According to Reed, on the day of the shooting one of his younger daughters was upset because she had seen their mother in bed with another man. Reed testified that he was hurt and his "whole world caved in." He said he cried off and on for the rest of the day and began drinking beer and Jim Beam. Later, Reed called Shirley to ask her about the situation, which she confirmed. Reed remembered at some point putting money in two envelopes on the computer desk at his mother's house where he was staying—one was for Shirley and one was for Reed's mother. Reed continued to drink throughout the day and eventually fell asleep on the couch. Later, he woke up and drove to Cedar Vale. However, Reed testified that he did not remember driving to Cedar Vale and, although he did not deny shooting Shirley and R.R., he did not remember shooting them.

After the jury convicted Reed of first-degree premeditated murder, attempted second-degree murder, and aggravated burglary, the district court sentenced Reed to a hard 50 life sentence for the first-degree premeditated murder conviction and an additional 91

months for the remaining convictions. The sentences were ordered to run consecutively. Reed now appeals. This court has jurisdiction under K.S.A. 22-3601(b)(1) (conviction of an off-grid crime).

### MOTION TO CHANGE JUDGE

In stating his first issue on appeal, Reed asserts the district court erred in failing to conduct a hearing on his pretrial "Motion to Change Judge," filed pursuant to K.S.A. 2005 Supp. 20-311d(a). However, Reed does not present arguments or authorities related to the failure to conduct a hearing. An issue not briefed by an appellant is deemed waived or abandoned. *State v. Holmes*, 278 Kan. 603, 622, 102 P.3d 406 (2004).

The issue which Reed does argue and, therefore, preserves is whether the denial of his motion to change judge resulted in a due process violation. A motion for a change of judge is governed by K.S.A. 2005 Supp. 20-311d. The first step of the procedure prescribed by that statute allows a party who "believes that the judge to whom an action is assigned cannot afford that party a fair trial in the action" to file a motion to change judge. K.S.A. 2005 Supp. 20-311d(a). "The motion shall not state the grounds for the party's or attorney's belief. The judge shall promptly hear the motion informally upon reasonable notice to all parties who have appeared in the case." K.S.A. 2005 Supp. 20-311d(a).

If the judge refuses to recuse, K.S.A. 2005 Supp. 20-311d(b) and (c)(5) provide that a party may file an affidavit stating the facts supporting the party's belief that the judge possesses bias, prejudice, or interest toward the case. Upon the filing of such an affidavit, the statute requires the Chief Judge to refer the affidavit to another district judge for "prompt determination" of the "legal sufficiency of the affidavit." K.S.A. 2005 Supp. 20-311d(b).

Reed filed a motion pursuant to K.S.A. 2005 Supp. 20-311d(a) seeking the recusal of Judge Rawley Dent II. Judge Dent denied the motion. Reed proceeded to the next step of the procedure and filed an affidavit in support of his motion for change of judge. In his affidavit, Reed alleged that Judge Dent was personally acquainted with Reed's family, that the judge was a member of the victims' church, that the judge's daughter was a best friend of one

of Reed's daughters, and that Reed's wife had been the school nurse at the school attended by Judge Dent's children. The motion was assigned to Judge Russell Canaday. Judge Canaday examined Reed's affidavit and found there were no grounds sufficient to require a change of judge. As a result, Judge Dent presided over Reed's trial.

On appeal, Reed contends Judge Dent's "personal associations" with the victims and the "close-knit" atmosphere of the community created "reasonable doubt" regarding the impartiality of Judge Dent. He argues, therefore, that he was denied a fair trial when his motion to change judge was denied.

The standard of review for a claim of error relating to a motion for change of judge is set forth in *State v. Alderson*, 260 Kan. 445, Syl. ¶ 2, 922 P.2d 435 (1996), as follows:

"When a district court refuses to recuse itself from a trial upon the defendant's request, this court has promulgated a two-part test to determine whether the defendant received a fair trial or whether the defendant's due process rights were violated: (1) Did the trial judge have a duty to recuse himself or herself from this case because the judge was biased, prejudicial, or partial? (2) If the judge did have a duty to recuse and failed to do so, is there a showing of actual bias or prejudice to warrant setting aside the judgment of the trial court?"

Regarding the first prong of this test, we have stated a judge should disqualify himself or herself if the circumstances and facts of the case "create reasonable doubt concerning the judge's impartiality, *not* in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances." *State v. Logan*, 236 Kan. 79, 86, 689 P.2d 778 (1984).

Reed argues he created this reasonable doubt. However, even if we were to assume for the purpose of determining legal sufficiency that Reed established this first part of the test, in order to establish a violation of due process, Reed must demonstrate actual bias or prejudice by the judge. "Bias" refers to the judge's mental attitude toward a party to the lawsuit. *Alderson*, 260 Kan. at 454. Bias and prejudice exist if a judge harbors a "hostile feeling or spirit of ill will against one of the litigants, or undue friendship or favoritism toward one." *State v. Foy*, 227 Kan. 405, 411, 607 P.2d 481

(1980); see *State ex rel. v. Sage Stores Co.*, 157 Kan. 622, 625, 143 P.2d 652 (1943). The record does not show that the judge actually exhibited bias or prejudice at Reed's trial.

In a roundabout attempt to argue that "actual bias" was shown, Reed asserts that the trial court's imposition of a hard 50 life sentence was overly harsh. Reed points out that he was 50 years old at the time of sentencing, had no criminal history, and "had cooperated fully with law enforcement during pre-trial proceedings." Reed implies that the trial court improperly refused to consider the mitigating evidence he presented during the sentencing hearing before imposing a hard 50 sentence. He argues that his crimes were motivated by the heat of passion, rather than planned by a cold, calculated criminal mind. Reed, however, does not raise sufficiency of the evidence arguments on appeal. There is clearly overwhelming evidence to support his convictions.

As for Reed's hard 50 sentence, K.S.A. 2005 Supp. 21-4635(b) provides that, when a defendant is convicted of first-degree premeditated murder for a crime committed after July 1, 1999, the court shall determine whether the defendant shall be required to serve a mandatory hard 50 term. In making such a determination, if the district court finds that one or more aggravating circumstances exist and are not outweighed by any mitigating circumstances that exist, the court must impose the hard 50 sentence. K.S.A. 2005 Supp. 21-4635(d).

Here, the trial court found two aggravating circumstances: (1) the defendant knowingly or purposely killed or created a risk of death to more than one person, and (2) the defendant committed the crime in an especially heinous, atrocious, or cruel manner. K.S.A. 2005 Supp. 21-4636(b), (f). As a basis for the second aggravating circumstance, the trial court specifically found (1) Reed's planning indicated the killing was meant to be especially heinous, atrocious, or cruel in that Shirley suffered 20 gunshot wounds while being pursued through the house and to the closet where she was hiding after already being shot; (2) Reed repeatedly shot Shirley while she was in the closet making a 911 call and while knowing she was going to be shot and killed; (3) Reed inflicted mental anguish or physical abuse upon Shirley by holding a gun to R.R.'s

head while threatening to kill the girl if Shirley did not come back into the room from which she had fled to escape the defendant; and (4) continuous acts of violence began before or continued after the killing when Reed shot at Shirley numerous times and then shot R.R. as he was walking out the door. See K.S.A. 2005 Supp. 21-4636(f)(2), (3), (5).

With respect to mitigating circumstances, the district court found that only one applied to Reed—his lack of prior criminal history. K.S.A. 21-4637. Reed had also claimed that the crimes were committed while he was under the influence of extreme mental or emotional disturbances and that the court should consider his age of 50. The trial court observed that the mental evaluations undergone by Reed did not support his claim of extreme mental or emotional disturbance. The court noted that the only evidence of such disturbances were self-reported by Reed to the evaluators. As for Reed's age, the court found he was not so old to lack the ability to understand the nature of what he was doing or to appreciate right from wrong. The trial court determined that the aggravating circumstances outweighed any mitigating circumstances.

The trial court's findings are supported by the record, and these findings, while adverse to Reed, do not reflect hostility or favoritism on the part of the judge. Reed's claim that the judge actually exhibited bias or prejudice fails. Therefore, Reed has failed to establish a due process violation.

## ADMISSION OF 911 CALL

Next, Reed contends the trial court erred by admitting into evidence, over defense counsel's objection, a taped recording of the 911 call. Reed argues the audiotape was cumulative to the testimony of the dispatcher and that the prejudicial impact of the recording substantially outweighed the probative value. These contentions have no merit.

Unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible at trial. See K.S.A. 60-407(f); *State v. Goodson*, 281 Kan. 913, Syl. ¶ 6, 135 P.3d 1116 (2006). Reed does not dispute the relevance of the 911

recording. Rather, he argues the evidence should not have been admitted because it was cumulative and unduly prejudicial.

Both of these objections arise from the trial court's inherent powers to exclude evidence which is cumulative and to exclude evidence when the probative value of the evidence is substantially outweighed by its potential prejudicial effect. *State v. Lee*, 266 Kan. 804, 813, 977 P.2d 263 (1999); *State v. Davis*, 213 Kan. 54, 57, 515 P.2d 802 (1973). The exercise of these inherent powers lies within the discretion of the trial court; therefore, an appellate court's review is subject to the broad abuse of discretion standard. *State v. Torres*, 280 Kan. 309, 327, 121 P.3d 429 (2005); *Lee*, 266 Kan. at 814-15. Under this standard of review, the trial court's determination will not be reversed unless it " 'is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.' " *State v. Holmes*, 278 Kan. 603, 623, 102 P.3d 406 (2004).

In objecting to the admission of the audiotape at trial, Reed's counsel noted that, before the State moved to admit the audiotape, the 911 dispatcher testified regarding the content of the 911 call and described the "horrendous screams" and other sounds she heard. Defense counsel asserted that in light of the dispatcher's testimony regarding the contents of the recording there was no reason to play the recording to the jury. Additionally, defense counsel argued that playing the recording offered no value other than to inflame the emotions and compassion of the jury. The State argued that the tape was the best evidence of exactly what happened on the night of the occurrence and that it was merely an "accurate and contemporary reconstruction of an intense event."

Although the trial court did not make a finding regarding the weighing of the probative and prejudicial value of the audiotape, the trial court noted that the recording offered a reconstruction of the event and found it significant in light of the defense theory that Reed acted in the heat of passion. The trial court found the audiotape was admissible, indicating that the tape was the best evidence to show the sequence of events and to "disprove" the heat of passion defense.

On appeal, Reed argues the admission of the audiotape is analogous to the admission of gruesome photographs and cites *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001), where this court stated:

"While the admission of gruesome photographs is rarely held to be an abuse of discretion, this court has done so in cases where the probative value was slight and the prejudicial effect great (other grounds for a mistrial were present). *State v. Harris*, 259 Kan. 689, 710, 915 P.2d 758 (1996). An abuse of discretion may be reached if the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice. [Citation omitted.]"

Reed acknowledges that this court has traditionally upheld the admission of 911 audiotapes. In *State v. Meeks*, 277 Kan. 609, 88 P.3d 789 (2004), the defendant argued it was error to play the entire recording of a 911 call made by a witness during the shooting. Defense counsel objected to the portion of the tape in which crying could be heard, arguing, *inter alia*, it was cumulative and unduly prejudicial. The district court held the recording was not unfairly prejudicial to the defendant and, further, probably conveyed better than any testimony what was going on at the scene. 277 Kan. at 619. On appeal, this court agreed with the district court and observed that the tape corroborated the testimony of several witnesses, particularly testimony regarding the victim's condition after the shooting. This court held the defendant failed to meet his burden of demonstrating that the district court abused its discretion by admitting the 911 recording. 277 Kan. at 620.

In *State v. Abu-Fakher*, 274 Kan. 584, 56 P.3d 166 (2002), the district court admitted an audiotape made by the defendant that recorded the events occurring before, during, and after the moment he shot his wife. The defendant sought to exclude the portion of the tape containing his wife's dying moans and gasps. This court recognized that the recording captured a shocking, gruesome event but concluded that the audiotape's probative value was strong. This court further observed that the recording corroborated the testimony of the defendant and a witness and captured the demeanor of the parties involved, including the changes in the demeanor of the defendant and his wife before, during, and after the shooting. In upholding the district court's admission of the audiotape, this

court held the recording was the "most probative and comprehensive evidence of the actual commission of the crime, the sequence in which events occurred, and their duration." 274 Kan. at 598; see also *State v. Williams*, 235 Kan. 485, 681 P.2d 660 (1984) (upholding admission of 911 tape that recorded conversations, screams, and other noises heard by dispatcher during victim's rape).

Similar to the situation in *Meeks* and *Abu-Fakher*, the 911 recording in this case corroborated the testimony of the dispatcher, the testimony of the officer to whom Reed offered confessions, and the testimony of R.R. The audiotape also captured Reed's demeanor at the time of the events, documented events and the duration of the incident, and was highly probative with respect to the essential element of premeditation.

Reed fails to show that the trial court abused its discretion in admitting the recording of Shirley's 911 call into evidence. It cannot be concluded that no reasonable person would take the view adopted by the trial court. See *State v. Bey*, 270 Kan. 544, 546, 17 P.3d 322 (2001).

### CONSTITUTIONALITY OF HARD 50 SENTENCING SCHEME

Finally, Reed contends the hard 50 sentencing scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Reed takes issue with the fact that, under the Kansas scheme, a jury does not determine the facts that increase the penalty beyond a reasonable doubt.

Reed's arguments have been repeatedly rejected by this court, most recently in *State v. Kirtdoll*, 281 Kan. 1138, 136 P.3d 417 (2006), and *State v. Lawrence*, 281 Kan. 1081, 135 P.3d 1211 (2006). Reed cites no new case law and offers no new argument. There is no reason to stray from precedent. Reed's sentencing argument fails.

Affirmed.