NOT DESIGNATED FOR PUBLICATION

No. 112,505

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID COCHRAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed March 18, 2016. Affirmed.

*Joanna Labastida*, of Kansas Appellate Defender Office, for appellant.

*Cheryl A. Marquardt*, assistant county attorney, *Todd L. Thompson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., LEBEN and POWELL, JJ.

*Per Curiam:* A jury convicted David Cochran of rape for having sexual intercourse with a child who was under 14 years of age. On appeal, Cochran makes four allegations of error: (1) The district court erred in admitting two videotaped interviews of the victim in addition to the victim's testimony at trial; (2) the investigating detective's testimony unlawfully encouraged the jury to draw a negative inference from Cochran's postarrest silence; (3) the district court's use of the word "should" when instructing the jury on the State's burden of proof negated the jury's right to nullification; and (4)

1

cumulative error. After a review of the record, we find no error and affirm Cochran's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In 2012, Cochran resided in Peculiar, Missouri, where he owned and operated a moving business. Cochran hired K.G., a lifelong friend, to work with him in the business. During the school year, K.G.'s 13-year-old daughter L.A.G. lived with her mother, C.M., in Kansas during the week and spent the weekends with her father in Missouri. In the summer, L.A.G. stayed with her father during the week and returned to her mother on the weekends. Throughout the summer of 2012, L.A.G. and her father spent considerable time together with Cochran, Cochran's girlfriend, and her 4-year-old daughter.

In the early morning around 1 a.m. of August 27, 2012, C.M. observed L.A.G. talking on her cellular phone. C.M. asked L.A.G. who was on the phone, and L.A.G. answered that she was talking to Cochran's girlfriend. After returning home from work the next evening, C.M. took L.A.G.'s phone to get the girlfriend's phone number. She then saw that between the evening of August 26 and the morning of August 27, 2012, L.A.G.'s phone received text messages from a phone number L.A.G. had added to her phone's contacts under the name "Catrice." The content of those text messages reflected that Catrice picked up L.A.G. from C.M.'s house at 2 a.m. and returned her at 5 a.m.

C.M. also saw that during the afternoon of August 27, L.A.G. had sent text messages to Catrice that read: "I just kept the both of us from being in jail for life," and, "We will have to do something else . . . . Mom got on the computer and she can see all of [our] texts." C.M. looked up the phone number associated with "Catrice" and learned it was the phone number of Cochran's moving company. On August 28, 2012, at approximately 1:56 a.m., C.M. took L.A.G.'s phone to the Leavenworth Police

2

Department to report her concerns about a 27-year-old texting her 13-year-old daughter and picking her up in the middle of the night.

Detective Danielle Herring was assigned to complete the investigation into the allegations of sexual abuse of L.A.G. C.M. provided Herring with copies of L.A.G.'s phone records showing both telephone calls and text messages between L.A.G.'s phone and Cochran's moving company. Herring twice called the number associated with "Catrice" on L.A.G.'s contacts list. A voice message identified the business name the first time she called; Cochran answered and identified himself the second time. Herring also observed photographic images on L.A.G.'s phone of Cochran and Cochran's fiancée.

On September 5, 2012, C.M. took L.A.G. to the Children Advocacy Center for a forensic interview by L. Kay Andersen and a sexual assault nurse examination by Julie Martinez. In the interview, L.A.G. told Andersen and Martinez that Cochran penetrated L.A.G.'s vagina. She also told Martinez that Cochran was her dad's best friend, that they had been texting one another, and Cochran had sex with her at the Days Inn in Leavenworth as well as outside of her dad's home in Missouri. Herring placed a copy of the video disc of the forensic interview of L.A.G. into Leavenworth Police Department evidence.

Herring went to the Leavenworth Days Inn and was told by the manager that Cochran had checked into the hotel at 2:20 a.m. on August 27, 2012, and had paid using his credit card.

The Cass County, Missouri, Sheriff's Department also conducted an investigation into the allegations of sexual abuse of L.A.G. by Cochran. During a forensic interview at the Children Protection Center in Kansas City, Missouri, L.A.G. stated that she and Cochran had sex outside of K.G.'s residence on more than one occasion.

Based on L.A.G.'s statements regarding having sex with Cochran at the Leavenworth Days Inn and the text messages indicating it occurred on August 27, 2012, the State charged Cochran with rape pursuant to K.S.A. 2015 Supp. 21-5503(a)(3) and (b)(2).

At the beginning of trial, the State sought to introduce both videos of L.A.G.'s forensic interviews prior to her testimony. Overruling Cochran's objection, the district court determined the videos were admissible because they might provide more detail than L.A.G.'s testimony. Additionally, during Herring's testimony, Cochran objected to what he argued were unresponsive answers in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), which the district court also overruled.

L.A.G. testified that she had sex with Cochran on three or four occasions in Missouri. She said that on August 26, 2012, she and Cochran made plans for Cochran to drive from his house in Missouri to her mother's house in Leavenworth. According to L.A.G., Cochran parked his vehicle near C.M.'s house at approximately 2 a.m.; L.A.G. left the house unseen, walked down the alley, and joined Cochran inside his vehicle. She and Cochran checked into the Leavenworth Days Inn, had sex, and then Cochran returned her to C.M.'s house at approximately 5 a.m.

Cochran's defense at trial was that L.A.G. fabricated their sexual relationship to conceal another sexual relationship she had with a different individual. The jury convicted Cochran of rape, and the district court sentenced him to life in prison without the possibility of parole for 25 years.

Cochran timely appeals.

DID THE DISTRICT COURT PROPERLY ADMIT INTO EVIDENCE
THE FORENSIC INTERVIEWS OF THE VICTIM?

Cochran's first argument is that the two videotaped interviews of L.A.G. were needlessly cumulative and served only to bolster L.A.G.'s subsequent testimony.

Generally speaking, "all relevant evidence is admissible." K.S.A. 60-407(f). K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." Evidence is material when the fact it supports is in dispute or at issue in the case, and review for materiality is de novo. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). Additionally, evidence is probative if it has any tendency to prove any material fact. *State v. Lowrance*, 298 Kan. 274, 289, 312 P.3d 328 (2013). We review the district court's assessment of the probative value of evidence under the abuse of discretion standard. *State v. Huddleston*, 298 Kan. 941, 959-60, 318 P.3d 140 (2014). A trial court has discretion to exclude relevant evidence where the court finds its probative value is outweighed by its potential for producing undue prejudice. *Lowrance*, 298 Kan. at 291.

> "Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

First, it is clear the video recordings of L.A.G.'s interviews were relevant. In *State v. Reed*, 300 Kan. 494, 332 P.3d 494 (2014), an 8-year-old victim produced a hand-written note prior to trial that detailed portions of her eventual testimony, and the Kansas

5

Supreme Court had no disagreement with the determination the note was relevant evidence in addition to the 8-year-old's testimony:

> "As [our Supreme Court] has previously recognized, prior statements by a witness are generally material and probative, *i.e.*, relevant, because the consistency or lack thereof between the statement and the testimony either corroborates or undercuts the witness' credibility. *E.g.*, *State v. Martinez*, 290 Kan. 992, 1001, 236 P.3d 481 (2010); see K.S.A. 60-401(b) (evidence is relevant if it has 'any tendency in reason to prove any material fact'); *State v. Prine*, 297 Kan. 460, 477, 303 P.3d 662 (2013) (discussing definition of relevant evidence); *State v. Reid*, 286 Kan. 494, 504-05, 186 P.3d 713 (2008) (same)." 300 Kan. at 506.

However, Cochran's real argument is that the interviews were needlessly cumulative and served only to bolster L.A.G.'s subsequent testimony, meaning they were unduly prejudicial to his defense.

> "Cumulative evidence is evidence that is unduly repetitious. See *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 (2002). Although a trial judge has the discretion to admit or exclude evidence that is cumulative, such evidence is not objectionable in and of itself. See *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996). Thus, a trial judge's ruling on cumulative evidence should not be reversed unless there has been an abuse of discretion. See *State v. Miller*, 284 Kan. 682, 701, 163 P.3d 267 (2007); *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006)." *State v. Jaeger*, No. 104,119, 2011 WL 6382749, at *8 (Kan. App. 2011) (unpublished opinion).

The State points out that L.A.G.'s videotaped interviews were not cumulative with her in-court testimony because (1) L.A.G.'s age and maturity level at the time of the interviews were significant issues for the jury in order to evaluate the text messages and communication between L.A.G. and Cochran; (2) L.A.G. appeared uncooperative, angry, and nervous for the majority of the first interview, displaying a demeanor that was itself not cumulative alongside her in-court testimony; and (3) Cochran's counsel made opening

6

remarks concerning inconsistencies between L.A.G.'s interviews, opening the door for the State to show the jury the interviews and thereby allow the jury to assess any inconsistencies for itself. Moreover, Cochran's counsel cross-examined L.A.G. concerning the events she alleged during both interviews, which also weighed heavily against the notion that the admission of the interviews unduly prejudiced Cochran.

Accordingly, we cannot say the district court abused its discretion in admitting the two videotaped interviews.

DID THE STATE'S WITNESS COMMIT *DOYLE* VIOLATIONS WHILE TESTIFYING?

Next, Cochran argues that the investigating detective's testimony encouraged the jury to draw a negative inference from Cochran's silence in violation of the Fourteenth Amendment to the United States Constitution and *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Whether an evidentiary ruling violated the defendant's constitutional rights is reviewed de novo on appeal. *State v. Robinson*, 293 Kan. 1002, 1023, 270 P.3d 1183 (2012).

"'*Doyle* and its progeny . . . stand for the principle that a defendant's silence *induced by government action* cannot be used to impeach his credibility. [Citation omitted.]'" *State v. Tully*, 293 Kan. 176, 186-87, 262 P.3d 314 (2011). However, "*Doyle* does not prohibit a prosecutor from impeaching a defendant [for] prearrest and pre-*Miranda* silence." 293 Kan. at 188. Accordingly, establishing a constitutional violation pursuant to *Doyle* requires the defendant to prove whether warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), had been given prior to the defendant's decision to remain silent. See 293 Kan. at 189; see also *State v. Wilkerson*, 278 Kan. 147, 157, 91 P.3d 1181 (2004) (noting record did not establish whether person was in custody or had received *Miranda* warnings before refusing to talk to investigators); *State v. Carter*, 30 Kan. App. 2d 1247, 1250-51, 57 P.3d 825 (2002)

7

(rejecting allegation of a *Doyle* violation because defendant failed to refer to any portion of the record indicating he had received *Miranda* warnings), *rev. denied* 275 Kan. 966 (2003); 3 LaFave, Israel, King & Kerr, Criminal Procedure § 9.6(a), p. 497 n. 47 (3d ed. 2007) (where defendant asserts *Doyle* violation, defendant "ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the State for impeachment purposes").

Therefore, our task is to determine whether Cochran established that Herring's testimony concerned his postarrest, post-*Miranda* silence. If so, Herring's testimony would amount to a violation of Cochran's constitutional rights.

Specifically, Cochran contends that Herring inappropriately stated several times that her investigation was hindered because Cochran would not speak to her and that she was told to stay away from Cochran by his attorney. The State counters that there was no *Doyle* violation because Herring's testimony related to Cochran's prearrest silence, not postarrest silence. Cochran takes issue with the following exchanges during Herring's direct examination:

> "[PROSECUTOR:] [W]ho did you understand that Mr. Cochran was living with in
> August of 2012?
> "[HERRING:] Based on the information given by [L.A.G.], *as Mr. Cochran did not
> interview with me*, I believe that he was living with Sarah, his girlfriend.
> "[PROSECUTOR:] Okay. And did you ever interview Sarah?
> "[HERRING:] I did not.
> "[PROSECUTOR:] Okay. And why not?
> "[HERRING:] I had been told—*Mr. Cochran told me that he had an attorney. I was also
> told not to speak to him or contact his client.* Sarah was living with Mr. Cochran at the
> time.
> . . . .
> "[PROSECUTOR:] Were you able to determine what David Cochran's actual address is
> in this case?

8

"[HERRING:] At this—at the time of this, I did not know his address. Again, *was unable to speak with him*." (Emphasis added.)

Later, during cross-examination, Cochran's defense attorney asked Herring questions concerning Cochran's vehicle:

"[DEFENSE:] Did you ever take any pictures of that vehicle?
"[HERRING:] Again, I didn't have that information until the prelim, approximately a year later.
"[DEFENSE:] Okay. Did you—did you ever—at that point, did you attempt to take any pictures of the vehicle?
"[HERRING:] No. *I had been instructed to stay away from Mr. Cochran or not speak to Mr. Cochran.*" (Emphasis added.)

Unfortunately for Cochran, he ignores the fact that the record on appeal does not establish that he had been arrested and advised of his rights pursuant to *Miranda* at the time he decided to remain silent during Herring's investigation. In his brief, Cochran admits that "it is somewhat unclear when Herring was told that Mr. Cochran had an attorney and that he did not wish to speak with her[.]" The State asserts that Cochran had not been arrested during the instances described in the quoted portions above. Herring testified that she initiated her investigation on September 6, 2012, which was well before Cochran's arrest on May 13, 2013. As Cochran has not met his burden of establishing a *Doyle* violation and makes no other arguments concerning the admissibility of Herring's testimony, we conclude there was no constitutional violation and the district court did not abuse its discretion in admitting Herring's testimony.

9

DID THE DISTRICT COURT ERR IN INSTRUCTING THE JURY
ON THE STATE'S BURDEN OF PROOF?

For the first time on appeal, Cochran argues that the language in the standard PIK Crim. 4th instruction defining the State's burden of proof in his case—"If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *should* find Mr. Cochran guilty" (emphasis added)—was inappropriate because the word "should" negated the jury's right to nullify his conviction. Instead, Cochran contends the instruction should have provided: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *may* find Mr. Cochran guilty."

The standard of review when addressing challenges to jury instructions is based upon the following analysis:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015) (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]).

A party cannot claim the district court erred in giving a jury instruction unless (1) the party objects before the jury retires, stating distinctly the matter to which the party objects and the grounds for the objection, or (2) the instruction is clearly erroneous. *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). We use a two-step process in determining whether the challenged instruction was clearly erroneous. First, we must

consider if there was any error at all by considering whether the instruction at issue was both legally and factually appropriate, employing an unlimited review of the entire record; second, if we find error, we must assess whether we are firmly convinced the jury would have reached a different verdict without the error. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484, *cert. denied* 135 S. Ct. 728 (2014).

Our analysis begins with the question of whether Cochran's proposed jury instruction is legally appropriate. Cochran contends the word "may" should have been substituted for the word "should" when the district court instructed the jury on the State's burden of proof. Cochran insists that use of the word "should" misinforms the jury into thinking it cannot nullify a conviction and instead coerces the jury into convicting the defendant.

In *State v. Jones*, No. 111,386, 2015 WL 4716235, at *5-6 (Kan. App. 2015) (unpublished opinion), another panel of this court recently assessed whether replacing "should" with "may" in the reasonable doubt instruction is legally appropriate:

> "Jury nullification is:
>> "'A jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." Black's Law Dictionary 875 (8th ed. 2004).' *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008).
>
> "Jurors in a criminal case can acquit a defendant by disregarding the rules of law and evidence; however, defendants are not entitled to have a nullification instruction provided to the jury. 38 Kan. App. 2d at 890.
>
> "The Kansas Supreme Court has disapproved of the '"do what you think is fair" instruction' that used to be set forth in PIK Crim. 51.03. *State v. McClanahan*, 212 Kan. 208, 215-16, 510 P.2d 153 (1973). 'The administration of criminal justice in this state would not be served by approving either the theory or form of such an instruction. The

11

tenor of the instruction militates against our generally accepted law as to the diverse functions of court and jury.' 212 Kan. at 215.

"In *State v. Naputi*, 293 Kan. 55, 65, 260 P.3d 86 (2011), Naputi, despite acknowledging *McClanahan*'s holding, argued the district court erred because 'it declined to modify a jury instruction on the burden of proof to reflect the jury's power of nullification' and claimed 'the jury's inherent power to [nullify] should be reflected in the jury instructions.' After discussing *McClanahan*, our Supreme Court held: 'It is not the role of the jury to rewrite clearly intended legislation, nor is it the role of the courts to instruct the jury that it may ignore the rule of law, no matter how draconian it might be.' 293 Kan. at 66.

"The Kansas Supreme Court has consistently decided that jury instructions informing juries of the power of nullification are not appropriate. See *State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014); *Naputi*, 293 Kan. 55, Syl. ¶ 4; *McClanahan*, 212 Kan. at 210-17. Because there is no indication the court is departing from its previous decisions, we are bound to follow the established precedent. *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011), *rev. denied* 294 Kan. 946 (2012).

"In this case, Jones requested the district court to issue a modified burden of proof instruction that embodied the spirit of jury nullification. Jones proposed the following instruction:

'The State has the burden to prove Mr. Jones is guilty. Mr. Jones is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence beyond a reasonable doubt that he is guilty.

'The test you must use in determining whether Mr. Jones is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find Mr. Jones not guilty. *If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you may find Mr. Jones guilty.*' (Emphasis added.)

"Jones contends the use of 'may' in the second paragraph of the proposed instruction was proper because the jury was not under an obligation to make a guilty finding. . . .

"The following instruction was provided to the jury:

12

'The State has the burden to prove the defendant, Brian Jones[,] is guilty. The defendant, Brian Jones[,] is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

'The test you must use in determining whether the defendant, Brian Jones[,] is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant, Brian Jones[,] not guilty. *If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant, Brian Jones[,] guilty.*' (Emphasis added.)

"Jones claims his proposed jury instruction was legally appropriate because the PIK instruction spoke in terms of a mandatory adjudication of guilt and, thus, erroneously informed the jury that it had no right to nullify. Although the use of PIK instructions is not required, it is strongly recommended, as those instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. 'Absent a particular need under the facts of a case to alter . . . PIK instructions, they should be followed.' *State v. Acevedo*, 49 Kan. App. 2d 655, 663, 315 P.3d 261 (2013), *rev. denied* 300 Kan. 1104 (2014). Jones' requested jury instruction was not legally appropriate."

*Jones*' analysis is well-taken. The panel in *State v. Singleton* perhaps stated it best, however, when explaining that the word "should" falls short of being an imperative:

"But as every teacher instructing a class knows, and as every parent admonishing a child knows, should is less of an imperative than must or will. See *State v. Pennington,* 254 Kan. 757, 764, 869 P.2d 624 (1994). Nutritionists urge that we all should eat our vegetables. But that does not constitute a directive to have recalcitrant diners force-fed their vegetables if they do not comply. A parent admonishing a child that he should eat his lima beans is clearly less of an imperative than the phrase every child has heard at one time or another, 'You *will* eat your lima beans!' Should as used in this instruction is not the equivalent of 'must' or 'will' used in the instructions discussed in [*State v.*] *Lovelace*[, 227 Kan. 348, 607 P.2d 49 (1980)] and [*State v.*] *Smith-Parker*[, 301 Kan. 132, 340 P.3d

13

485 (2014)]. *Should* is advisory. It is not an imperative. The district court did not err in giving this instruction." *State v. Singleton*, No. 112,997, 2016 WL 368083, at *6 (Kan. App. 2016) (unpublished opinion).

We agree. Cochran's proposed jury instruction would not have been legally appropriate.

DID AN ACCUMULATION OF ERRORS DEPRIVE COCHRAN OF A FAIR TRIAL?

Finally, Cochran argues that even if he has not raised an issue which, standing alone, requires reversal, the cumulative effect of the district court's errors mandates a new trial. Unfortunately for Cochran, "'[c]umulative error will not be found when the record fails to support the errors raised on appeal by the defendant. [Citations omitted.]'" *State v. Novotny*, 297 Kan. 1174, 1191, 307 P.3d 1278 (2013) (quoting *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 [2009]). When the appellant fails to demonstrate "two or more trial errors not individually reversible, the cumulative error doctrine is inapplicable." *State v. Hilt*, 299 Kan. 176, 200, 322 P.3d 367 (2014). Because we find no errors in Cochran's conviction, there is no cumulative error.

Affirmed.