NOT DESIGNATED FOR PUBLICATION

No. 118,522

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v

JIMMY E. PALMER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed February 15, 2019. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., MALONE and LEBEN, JJ.

LEBEN, J.: Jimmy Palmer appeals his conviction and sentence for intentional second-degree murder. His main contentions are that the district court should have allowed his attorney to play a tape-recorded statement of a witness and that the district court should have allowed the jury to consider convicting him of unintentional (or reckless) second-degree murder.

But even if the district court wrongly kept the recording out of evidence, Palmer's attorney extensively cross-examined that witness about what she had said on the recording. And the witness admitted that she had told a different story in the recorded

interview but told the jury she had been lying at that time. In light of the extensive cross-examination, we are not persuaded that any error in keeping that recording out of evidence affected the trial outcome.

And while there was some evidence to support the idea that Palmer didn't intend to kill the victim, Palmer didn't ask to have the jury instructed on unintentional second-degree murder. So the defendant must show what's called clear error, meaning that he must firmly convince us that the jury would have reached a different verdict had it received this additional instruction. We find the evidence for intentional second-degree murder much stronger than the evidence for unintentional second-degree murder. We therefore are not firmly convinced that adding this instruction would have affected the jury's verdict.

Palmer also raises two other issues—that the evidence wasn't sufficient to show an intentional murder and that the court should have given him a shorter sentence given his circumstances. But we find ample evidence of intent and no abuse of discretion in the district court's sentencing decision. We affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Palmer lived at Calvary Towers, a federally subsidized apartment building in Wichita that has many low-income and disabled older residents. Palmer's daughter said he received disability benefits and had somewhat limited mental abilities. He also had diabetes and had suffered a stroke in 2015, the year before the murder.

More significantly, Palmer had a past dispute with Gilford Carter, another Calvary Towers resident. Several years before the events leading to this case, Carter had beaten Palmer with a golf club, fracturing Palmer's arm and scarring his face. During that

2

altercation, Palmer had bitten Carter's ear. Palmer thought Carter would have killed him had another person not been present to break up the fight.

Shortly after that fight, Carter went to prison for an unrelated crime. But upon his release from prison, he moved back into Calvary Towers—and unfortunately onto the same floor as Palmer.

Carter began to threaten Palmer. Palmer became angry and said he was "tired of running," so he decided to confront Carter.

On May 4, 2016, the two men began arguing in the Calvary Towers parking lot. Palmer's daughter, Yiekia Edmond, witnessed the argument. Carter made new and vicious threats: "[L]ook at your face, nigger. I did that shit, and I'm going to finish what the fuck I started," and "I'll let you slide for right now, but I'm going to get you."

Edmond said she told Carter that if he touched her dad, she would stab Carter. Carter ended the discussion: "I'm going to get you. It starts now."

Palmer went back to his apartment; Carter went beyond the parking lot before returning. When Edmond saw Carter returning, she went to her father's apartment "so I could see if [Carter was] trying to do something to my daddy."

Edmond got to the top of some steps as Carter was coming back down—he had a golf club in his hand. Carter's sister testified that Carter didn't golf but kept a club for protection. As he passed Edmond, Carter said to her, "[Y]eah, it's on again."

Edmond headed to her father's apartment. She warned him about the interaction she'd just had with Carter. She also told Palmer that she didn't think the Taser he'd bought for protection would be enough to counter the golf club. She told him that Carter would

3

try to kill him if Palmer tried to use the Taser. Palmer said he was tired of Carter's behavior. Meanwhile, according to neighbor Curley Shears, Carter was outside swinging the golf club and telling people what he would do to Palmer.

Edmond and Palmer headed downstairs. She told Palmer to use a side stairway in case Carter was waiting by the main staircase. She went down first and told Palmer to come on out when she saw that Carter wasn't waiting at the bottom of the stairs.

Edmond then headed to her car to leave, but she turned around and saw her father headed in the opposite direction toward Carter. Carter was waiting with his golf club. Edmond saw a gun in Palmer's hand.

She walked toward the men and watched what happened. She said Palmer told Carter he didn't understand "why we can't be in this world together, we can get along." But when Carter saw the gun, she said he went crazy:

> "[Carter] started callin' my daddy, bitch ass nigger. He said, this bitch ass nigger got a gun. You ain't gonna use it, bitch ass nigger. He started walking closer and closer. They was far enough apart where he couldn't hit dad with the golf club. But he kept calling him, bitch ass nigger, you ain't gonna shoot me. You bitch ass nigger. He kept walking up to him getting closer and closer. I said, Daddy—my daddy started shaking. I said, Daddy, don't let him take that gun from you. Because he's fixin' to hit my daddy and take the gun from him."

Palmer pointed the gun directly at Carter. Carter drew the golf club back like a baseball bat. Carter also taunted Palmer, repeatedly saying to "shoot me." When Carter got close enough to hit Palmer with the golf club, Palmer shot him. Palmer said he believed Carter would have killed him had he not shot Carter.

4

Palmer fired a single shot into Carter's chest. Carter turned to run away but collapsed. Palmer gave the gun to Edmond, who left. Palmer then walked over to where Carter lay bleeding and "[a]sked him why he made [me] do that to him." Palmer also asked Carter, "[D]idn't your mother ever tell you not to fuck with things that would kill you[?]"

Someone told the Calvary Towers manager, Valincia Jones, there'd been a shooting. She came out and heard Palmer crying. She said Palmer told Carter, "I'm going to sit here until you die because you tried to kill me." Carter died from the gunshot.

Jones said that Palmer told her that he hadn't wanted to shoot Carter but that he had been scared. Palmer also told her that Carter had been trying to kill him.

When police arrived, Palmer put his hands up and walked toward them. He told them he was the shooter. He also told them he hadn't wanted to kill Carter; he said he had merely wanted to wound him so that Carter couldn't hurt Palmer or anyone else.

The State charged Palmer with second-degree murder but eventually amended the charge to premeditated first-degree murder. Palmer claimed self-defense immunity under our state's stand-your-ground law, but the district court ruled that he didn't qualify for that immunity because Palmer had reinserted himself into a volatile situation (by coming down from his apartment to confront Carter) rather than seeking other nonviolent resolutions.

At trial, the jury was told it could convict Palmer of first-degree premeditated murder or of second-degree intentional (but not premeditated) murder. Palmer sought acquittal based on self-defense. The jury convicted him of second-degree intentional murder.

5

At sentencing, the presumptive sentencing range under our state's sentencing guidelines ranged from 203 to 226 months in prison. Palmer asked for a shorter sentence—known as a downward-durational-departure sentence—based on several grounds, including his age, fragile health, and lack of prior violent offenses. The district court granted a reduced sentence of 175 months.

Palmer has appealed both his conviction and his sentence to this court.

I. *The District Court's Decision Not to Admit a Tape-Recorded Witness Interview Was at Most Harmless Error, Not Cause to Reverse a Jury's Verdict.*

Palmer's first issue is that the district court wouldn't allow him to play a tape recording of an interview his attorney had with Edmond to the jury. While Edmond testified to the jury that Palmer had gotten the gun before the day he shot Carter, she had told the defense attorney at an earlier time that she had given the gun to her father that same day—and only after he'd left his apartment to go downstairs. That's a big change in her story and one that's significant to the case—why Palmer had the gun with him when he came downstairs from his apartment was a critical question. Was he already planning to shoot Carter? Did Edmond simply suggest en route that he take a gun, one that she'd just given him, with him for protection?

Confronting witnesses with evidence that they said different things at different times is one of the ways lawyers can cast doubt on witness credibility. In the law of evidence, it's called impeachment of the witness. And like all matters of evidence, there are rules to consult—in Kansas, the Kansas Rules of Evidence. They are set out in statutes found at K.S.A. 60-401 to K.S.A. 60-485.

Palmer argues that he should have been allowed to present the tape recording under the Kansas Rules of Evidence. In support, he cites K.S.A. 60-422. In its subsection

(b), that statute seems to prevent the trial judge from excluding presentation of the witness' contradictory statement as long as the witness has been given a chance to explain or deny the statement:

> "As affecting the credibility of a witness (a) in examining the witness as to a statement made by him or her in writing inconsistent with any part of his or her testimony it shall not be necessary to show or read to the witness any part of the writing provided that if the judge deems it feasible the time and place of the writing and the name of the person addressed, if any, shall be indicated to the witness; *(b) extrinsic evidence of prior contradictory statements, whether oral or written, made by the witness, may in the discretion of the judge be excluded unless the witness was so examined while testifying as to give him or her an opportunity to identify, explain or deny the statement*; (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible." [Emphasis added.] K.S.A. 60-422.

So that statute says that extrinsic evidence of a prior contradictory statement, like the one here, *may* be excluded *unless* the witness was given a chance to explain or deny the statement. Palmer's attorney gave Edmond that opportunity (she admitted she'd made the contradictory statement but said she had lied), so K.S.A. 60-422 didn't explicitly give authority to the trial judge to exclude presentation of the tape recording.

That understanding is supported by another provision in the Kansas Rules of Evidence, K.S.A. 60-420. Though the parties didn't cite it, K.S.A. 60-420 provides a general rule—subject to limitation by two other provisions—that extrinsic evidence *may* be presented on witness-credibility issues:

> "Subject to K.S.A. 60-421 and 60-422, *for the purpose of impairing or supporting the credibility of any witness, any party* including the party calling the witness *may* examine the witness and *introduce extrinsic evidence concerning* any conduct by

7

him or her and *any other matter relevant upon the issues of credibility*." (Emphasis added.) K.S.A. 60-420.

So the general rule is that you can present extrinsic evidence on credibility, "[s]ubject to" the rules in K.S.A. 60-421 and 60-422. But neither of those rules would have precluded presenting the recording to the jury. K.S.A. 60-421 relates to evidence of past crimes committed by a witness and isn't relevant here. And as we've already seen, K.S.A. 60-422 seems to limit the trial judge's ability to exclude contradictory statements as long as the witness is given the chance to deny or explain them. So Palmer has a potentially viable argument that he should have been allowed to present the tape recording under the Kansas Rules of Evidence.

But the State counters that there's a Kansas Supreme Court case from 1982 that says the trial judge *may* prohibit the playing of a contradictory tape recording when the witness has admitted to having made the earlier inconsistent statement. That case is *State v. Schlicher*, 230 Kan. 482, 493-94, 639 P.2d 467 (1982), and its holding is indeed contrary to Palmer's argument. In *Schlicher*, as here, the witness admitted having made contradictory statements, and the trial court didn't let the party impeaching the witness play the recorded inconsistent statement. Our Supreme Court held that the trial court had not abused its discretion and found no error. 230 Kan. at 493.

Palmer makes several arguments to get around the *Schlicher* case. We're not persuaded by his attempts to distinguish it; *Schlicher* and our case are quite similar. Nor are we persuaded by his claim that *Schlicher* supports his position, even though the *Schlicher* court said that a prior inconsistent statement could still be admitted into evidence "provided there is some good reason shown for its admission." 230 Kan. at 493. But the court also said that when the witness "clearly admits the prior inconsistent statement, the witness is thereby impeached and further testimony is ordinarily not

8

necessary." 230 Kan. at 493. That's our situation—Edmond admitted she had told a different story before.

Palmer's strongest response to the *Schlicher* case is his claim that it was wrongly decided. The *Schlicher* opinion doesn't really analyze the language of K.S.A. 60-422 and doesn't mention K.S.A. 60-420. And it relies in part on general evidentiary treatises that would have been based on different evidentiary rules than the Kansas Rules of Evidence. Even so, our court must follow Kansas Supreme Court decisions unless that court has given some indication that it intended to depart from its prior position. *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014).

There are some reasons to think that the Kansas Supreme Court today might more closely examine the statutory language, not other sources, to determine this evidentiary issue. Courts generally focus much more today on statutory language than they did back in 1982; the Kansas Supreme Court is no exception. And it has been known to reconsider past evidentiary rulings that didn't conform to statutory language. E.g., *State v. Gunby*, 282 Kan. 39, 51-57, 144 P.3d 647 (2006). On the other hand, we can think of at least one other rule of Kansas evidence that would support the *Schlicher* ruling: the trial court has inherent authority to exclude cumulative evidence. See *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 72-73, 274 P.3d 609 (2012); *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006). Here and in *Schlicher*, the witness had already admitted having made the inconsistent statement, so playing a recording of it was arguably cumulative evidence that could be excluded as unnecessary.

But we need not decide whether the Kansas Supreme Court today would overrule *Schlicher*. That's because even if the trial court erred in refusing to allow Palmer to play the recording, we must also consider the State's separate argument that any error was harmless. On that question, the State must show that there is no reasonable probability that the error affected the trial's outcome. *State v. McCullough*, 293 Kan. 970, 983, 270

9

P.3d 1142 (2012). Given the extensive cross-examination Palmer's attorney did of Edmond about her inconsistent statements, we find any error in excluding the recorded statement harmless.

Let's consider that cross-examination. When the trial court ruled that the tape couldn't be played for the jury, it also told defense counsel, "You can ask her all you want about the inconsistent statements . . . ." And he did.

The defense argument is that the jury could have made a better determination about whether Edmond's trial testimony was truthful if it could have heard her inflections and pauses on the recording. But the jury got to see and hear Edmond at trial while she told what she said had happened. Palmer's attorney extensively cross-examined her, and she admitted that she had made inconsistent statements. She also gave an explanation— that she had wanted to protect her father.

The defense wanted to play the recording in an attempt to convince the jury that Edmond's earlier story—that she had given the gun to Palmer as he went downstairs to confront Carter—was true. But even if that were true, Palmer was the one who, gun in hand, moved toward Carter. Palmer was the one who aimed the gun at Carter's chest. And Palmer was the one who chose to fire that gun. How he got the gun was relevant. But given the extensive cross-examination of Edmond on whether she gave Palmer the gun, there is no reasonable probability that any error in preventing admission of the tape recording affected the jury's verdict. We agree with the State that any error here was harmless.

10

II. *The District Court's Failure to Give the Jury the Option to Convict Palmer of Unintentional Second-Degree Murder Was Not Clear Error.*

Palmer next claims that the district court should have given the jury the option to convict him of a lesser form of second-degree murder. While the State had charged Palmer with premeditated first-degree murder, the district court recognized that the evidence might not support the claim of premeditation—that Palmer had thought the matter over beforehand with at least some time for reflection or deliberation. See *State v. Kettler*, 299 Kan. 448, 466-67, 325 P.3d 1075 (2014). So the court also gave the jury the option to convict Palmer of intentional second-degree murder, which doesn't require premeditation.

But to be guilty of intentional second-degree murder, Palmer must have specifically intended to kill Carter. See *State v. Deal*, 293 Kan. 872, 883, 269 P.3d 1282 (2012). Palmer told police at the scene and the jury at trial that he hadn't intended to kill Carter; Palmer said he had only wanted to wound Carter as an act of self-defense. So Palmer argues on appeal that the trial court should have given the jury the option to convict him of another lesser form of murder, unintentional second-degree murder. To convict Palmer of that offense, the State would have to prove that Palmer acted recklessly, with knowledge that Carter was in imminent danger but without realizing Palmer's act would kill Carter. See 293 Kan. at 884.

Palmer's claim on this point has an extra hurdle to clear—he didn't ask the district court to give instructions to the jury about unintentional second-degree murder. Because of that, he must show what's called clear error. Under that standard, we set aside the jury's verdict only if Palmer firmly convinces us that the jury would have reached a different result had the instruction error not occurred. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

Before we get to that, of course, we must first determine whether there was an instruction error at all. To do that, we must determine whether giving the jury the option to convict of unintentional second-degree murder was legally and factually appropriate. See *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018). Here, it was both.

Legally, unintentional second-degree murder is a lesser-included offense for both first-degree murder and intentional second-degree murder. *McLinn*, 307 Kan. at 324. Factually, Palmer testified that he didn't intend to kill Carter, and there's some additional evidence consistent with that view. One witness at the scene said that Palmer, crying after the shooting, told her that he hadn't wanted to shoot Carter and had told Carter to leave him alone. There was also evidence that Palmer acted in self-defense as Carter came at him swinging a golf club.

Because it would have been factually and legally appropriate to have given the jury the option of unintentional second-degree murder, the district court should have done so. But even though the jury should have been given that option to consider, we are not convinced that the jury would have reached a different verdict had that option been available. The evidence that Palmer intended to kill Carter is stronger. Palmer chose to leave his apartment to confront Carter. Then, even though Carter had a golf club at the ready, when Palmer got downstairs from his apartment, he headed toward Carter with the gun already in his hand—a gun that had to be manually cocked before firing. Palmer fired a single shot at close range directly into Carter's chest. And a witness heard Palmer saying to Carter, lying on the ground after having been shot, "I'm going to sit here until you die because you tried to kill me." We find no clear error here.

12

III. *Sufficient Evidence Supports the Conviction.*

Palmer next argues that there wasn't enough evidence to convict him of intentional second-degree murder. Palmer argues that the State lacked evidence that he specifically intended to kill Carter.

But as we've just discussed, we find greater evidence that Palmer intended to kill Carter than that he didn't. And when we review whether the evidence is enough to support the jury's verdict, we must look at the evidence in the light most favorable to the State. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). When we do so, the evidence is clearly enough to convict. Palmer chose to leave the safety of his apartment, not to call police, or proceed in some other manner. When he left his apartment, he came with a gun—and he already had it in his hand when he headed toward Carter to confront him. Palmer then pointed the gun at Carter's chest and fired when Carter was at close range. On this evidence, the jury could conclude beyond a reasonable doubt that Palmer intended to kill Carter.

IV. *The District Court Did Not Err by Not Giving a Shorter Sentence to Palmer*.

Palmer's final claim is that he should have received a shorter sentence. Under the Kansas sentencing guidelines, Palmer's presumptive sentencing range was from 203 to 226 months in prison. Palmer asked that the court give him what's known as a departure sentence—a shorter sentence than called for under the guidelines. The district court did so, sentencing Palmer to prison for 175 months. Palmer argues on appeal that the court should have departed even more from the guidelines and further shortened Palmer's time in prison.

We review a departure sentence for abuse of discretion. *State v. Rochelle*, 297 Kan. 32, 45, 298 P.3d 293 (2013); *State v. Spencer*, 291 Kan. 796, 807-08, 248 P.3d 256

13

(2011). A district court abuses its discretion (1) when its decision is based on an error of fact or law or (2) when no reasonable person would agree with the decision. *Rochelle*, 297 Kan. at 36. Palmer contends that no reasonable person would agree with the sentence he got.

Before we discuss whether the court abused its discretion, we need to explain what a defendant must show to get a departure sentence. K.S.A. 2017 Supp. 21-6815 allows a judge to impose a departure sentence for substantial and compelling reasons. The Kansas Supreme Court has interpreted substantial to mean something that's real, not ephemeral, and compelling to mean that a court is forced by the facts to go beyond what is ordinary. *State v. Sampsel*, 268 Kan. 264, 280, 997 P.2d 664 (2000). The sentencing court looks to the mitigating factors as a whole to determine whether there are substantial and compelling reasons to depart from the presumptive sentence in light of the offense, the defendant's criminal history, and the purposes of the guidelines. *State v. McKay*, 271 Kan. 725, 728, 26 P.3d 58 (2001). Even then, the district court need not depart from the presumptive sentence; a statute says that the judge *may* depart, not that the judge *must* do so, when a departure sentence is appropriate. K.S.A. 2017 Supp. 21-6818(a).

Palmer sought a shorter sentence based on his age, his fragile health, a lack of violent offenses in his criminal history, and the significant time since he'd had a prior felony offense. Palmer also argued to the district court that even though the jury hadn't accepted his theory of self-defense, there were extenuating circumstances based on Carter's aggression, both in the past and on the day he was killed. The district court agreed that a departure sentence was appropriate, citing Palmer's age and health as well as two factors related to his past offenses—his felony offenses had been long ago and he didn't have a history of violent offenses.

So how do we judge whether the district court's decision to cut 28 months off the lowest guidelines sentence—but no more—was a reasonable one? The Kansas Supreme

14

Court has said we should look to see whether the sentence adheres to the purposes of the sentencing guidelines and is proportionate to the severity of the crime and the offenders' criminal history. *Spencer*, 291 Kan. at 807; *State v. Favela*, 259 Kan. 215, 244, 911 P.2d 792 (1996). Among the sentencing guidelines' purpose is ensuring that prison space is reserved for serious, violent offenders who pose a public-safety threat. 259 Kan. at 233.

The district court found that there were mitigating factors in Palmer's case and that they were substantial and compelling reasons for a departure sentence. But when we consider whether the district court abused its discretion by not departing even more, we must consider not only the mitigating factors Palmer has noted but also the nature of this offense. Palmer stands convicted of intentionally murdering Carter.

The district court did not have to grant Palmer any durational departure, even given the reasons Palmer gave. The length of sentence the district court chose is a reasonable departure sentence here. We find no abuse of discretion.

We affirm the district court's judgment.